THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANIEL ANDERSEN, Defendant-Appellant.

First District (4th Division)   No. 82—1444

Opinion filed June 13, 1985.

Sheila M. Murphy, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Kevin Sweeney, and John Legutki, Assistant State's Attorneys, of counsel), for the People.

JUSTICE JOHNSON delivered the opinion of the court:

In a jury trial defendant Daniel Andersen was convicted of attempting to rape and then murdering Cathy Trunko. He was sentenced to concurrent prison terms of 30 and 55 years for those respective crimes. On appeal defendant contends: (1) a series of incriminating statements by him should have been suppressed because (a) they resulted from an arrest made without probable cause, (b) defendant made them while in an intoxicated state, (c) they were tainted by an improperly obtained statement that was suppressed; (2) the statement that was suppressed was then improperly allowed into evidence; (3) the trial court erred in barring evidence of defendant's history of alcoholism; (4) defendant's guilt was not proved beyond a reasonable doubt.

We affirm.

Prior to trial defendant moved to suppress a series of incriminating statements made by him following his arrest. At the hearing on that motion the following pertinent evidence was introduced. Chicago police officer James Bednarkiewicz testified that on January 23, 1980, at about 11 p.m. he was told by Officer Michael Riley that defendant was in possession of a weapon and was driving a silver Pinto. It was stipulated that if called to testify Officer Riley would have stated that earlier that evening defendant's mother telephoned him to obtain his help in bringing home the defendant, who was drunk and driving.

At about 1:30 a.m. on January 24, 1980, Officer Bednarkiewicz and his partner, Officer Paul Nielsen, stopped a silver Pinto driven by a person subsequently identified as Norman Venegas. A search of Venegas and the car produced no weapons. Nielsen drove the Pinto to defendant's house at 5119 South Hermitage in Chicago, while Bednarkiewicz drove the squad car to the same location, with Venegas in the back seat.

On arrival Bednarkiewicz saw the defendant walking toward him. Defendant did not immediately respond to his order to put his hands on a parked car, so Bednarkiewicz forcibly turned him around against the car. A search of the defendant produced no weapon. While Riley

remained with the defendant, Bednarkiewicz spoke to defendant's mother at the house. He asked if she wanted defendant left with her or taken in to the station. Defendant's mother said she was having trouble controlling defendant; he was in a mixed-up state of mind and kept coming in and out of the house, causing a disturbance. She signed a disorderly conduct complaint against him, and defendant was handcuffed and placed in the squad car for the five-minute ride to the Ninth District police station. Venegas was taken to the station in another squad car.

In the car Bednarkiewicz twice asked defendant what he had done with the weapon. Defendant denied any knowledge of a weapon and said he had been out drinking with some friends. Defendant asked for a cigarette and was told he could have one at the station. No further conversation occurred until the car arrived at the station parking lot. Defendant then stated, "I stabbed her." Bednarkiewicz asked, "Who?" and defendant responded, "Cathy." Nothing more was said until they all entered an office at the station. There defendant's handcuffs were removed and he was given a cigarette. (On cross-examination, Bednarkiewicz stated that defendant was handcuffed with one hand to a locker.) Bednarkiewicz informed defendant for the first time of his *Miranda* rights, and defendant stated that he understood them and wished to waive them. Defendant responded to booking questions concerning his name, address and date of birth. He was then asked how he had stabbed Cathy. He demonstrated that he had stabbed her once on one side of the chest and twice on the other side. He was asked what he had done with the knife and stated he had thrown it on Hermitage.

Bednarkiewicz admitted that on the police report he had checked the box indicating that defendant was intoxicated when arrested. (On this standard form two other boxes indicate an arrestee was either sober or had been drinking.) When he initially stopped defendant, Bednarkiewicz could smell alcohol on his breath, and defendant was belligerent and loud. Based on this, it was his opinion that the defendant had been drinking. However, at the police station defendant was calm and gave understandable responses that were in context.

According to Bednarkiewicz, defendant was kept at the station until 3:20 a.m. Defendant never asked for food or water, was not promised any food if he talked, and was not given incorrect facts concerning Cathy's murder. Nobody struck the defendant.

Norman Venegas, a "close friend" of the defendant, testified that around noon on January 23, 1980, defendant came to Venegas' place of work drunk. He also drank two beers while there but was able to carry

on a conversation with Venegas and had no difficulty speaking. They again met at midnight at the Red Mist Tavern, where they drank for an hour. Venegas recalled that defendant drank three beers, three shots of blackberry brandy, and one shot of vodka. They drove around the neighborhood, sharing two marijuana cigarettes, and then returned to the Red Mist, where they each had another shot and a beer. Because defendant was "pretty well intoxicated," Venegas took defendant's car home, leaving defendant at the bar. At this time defendant was still able to talk, but his voice was very deep and difficult to understand.

On the way to defendant's house Venegas was stopped by the police, who thought he had a gun. When Venegas was subsequently transported to defendant's house, he saw the police twisting defendant's arm behind his back. They questioned defendant about a girl who had just been murdered in the neighborhood. Defendant was crying, saying that he knew the girl. According to Venegas, the back windows of the squad car were rolled down, and he put his head out the window to yell at the police to leave defendant alone.

After being held on the street for about 15 minutes with his arm twisted, defendant was handcuffed and driven away. Venegas was taken to the police station and for a time was placed in a room with the defendant. Defendant, who was "pretty well intoxicated," and had both hands handcuffed to a locker, kept asking for water but was told by the police to shut up. Defendant's throat was hoarse. After several hours Venegas was given a traffic ticket and sent home. He recalled that the day after Cathy was killed the defendant had told him he knew who killed her. Defendant was drunk, and when Venegas inquired further, defendant told him it was none of his business.

Ray Lasky, a friend of the defendant since the age of five, testified that defendant began drinking at the age of 13 and frequently drank to excess. On January 23 at the Red Mist the defendant was "getting kind of wild," so Lasky drove him home. During this ride defendant, who was drunk, talked incoherently about owning gold and silver mines. On arrival at defendant's house, defendant asked Lasky to stay while he went to see what the police wanted. He walked over to the police and began talking to them, at which point Lasky drove away.

Defendant's mother testified that defendant had had a problem with alcohol for a long time. On January 23, 1980, he had been drunk early in the day and she again saw him drinking between 2 and 3 p.m. That evening defendant's former employer called her to report that defendant was driving up and down the sidewalk. She called Officer Riley, a family friend, asking him to bring defendant home. Later that evening the police came to her home. At about the same time, she saw

the defendant walking or running up. In her opinion he was very drunk, although he ran without stumbling and she could understand his speech. Officer Bednarkiewicz came inside her front hallway and told her that defendant was wild and drunk. If she signed a complaint, defendant could sober up in jail. Through her picture window she could see another officer twisting defendant's arm and saying "You're the guy that did it." A person in the back of the squad car was telling the police to stop hurting the defendant. The windows of the car were rolled up.

Defendant's brother, Mark, testified that he was at home with his mother that evening and saw the police grab the defendant and twist his arm. The drapes on the picture window were closed, but he could see out through a side window. His mother was reluctant to sign the complaint, but the police told her the defendant would be released the next day. Mark testified that earlier, at about 7 p.m., the defendant had been drunk. Defendant was shouting and he could smell alcohol on his breath. However, he did not actually see the defendant drinking at any time that day.

Alex Salazar, defendant's friend for eight years, testified that in the early morning hours of January 24, 1980, he was at the Ninth District police station charged with criminal damage to property. He shared a lock-up cell with the defendant for about three hours starting at 2:30 or 3 a.m. Defendant's eyes were bloodshot, the right side of his face was red, and he appeared to be intoxicated. The defendant was unable to complete a conversation and kept asking who Salazar was. Defense counsel subsequently recalled Salazar to the stand and attempted to elicit from him a statement that he was mistaken as to the date of his incarceration, that it had been the following morning, but the trial court sustained the State's objection to this as attempted impeachment of counsel's own witness.

Defendant's father testified that he saw the defendant at the Ninth District station at about midnight on January 24, 1980. Defendant's eyes were red, he had a deep voice from a sore throat, the right side of his face was red, and there was a gash on the top of his forehead. He appeared very nervous and said the police would not let him call. However, he also said he did not need an attorney because Detective James Higgins said he was his attorney. Defendant told his father he would soon be released and would be going to California. He did not complain of any police mistreatment.

Defendant's uncle, Father Raymar Boller, a hospital chaplain with the Veteran's Administration, testified that he was familiar with the physical reactions experienced by alcoholics when they stopped drink-

ing. On January 26, 1980, he saw the defendant at the hospital for 45 minutes. Defendant was nervous and sometimes incoherent. He had a cut on his forehead and swollen wrists from the handcuffs. Defendant told Boller he would soon be going to California. He also gave Boller a message for Detective Higgins, written in what he said was a code he and Higgins had devised. It was Boller's opinion that defendant was under the influence of alcohol or other drugs.

Also testifying for defendant at the hearing was Dr. Donald Sellers, medical director of the Lutheran Center for Substance Abuse in Park Ridge. Sellers testified that he was a board-certified psychiatrist specializing in drug abuse with a subspecialty in alcohol abuse. According to Sellers, alcoholism is a disease which creates an uncontrollable compulsion to drink. Under the influence of alcohol people may become totally irrational, unable to perceive reality, and may lose control over their behavior.

Sellers had been told by defendant's mother that defendant had been drinking since the age of 12 and had increasingly used alcohol to excess. Father Boller had told Sellers of his observations of the defendant at the hospital. In two interviews conducted with the defendant in January and February of 1981, defendant had told Sellers that he was drinking every day by the age of 14. Defendant also stated that after being jailed he became delirious and was transferred to a hospital for treatment.

Based on this information, it was Dr. Sellers' opinion that defendant was a chronic alcoholic suffering from toxic brain syndrome at the time of his arrest. Sellers also testified that Actifed, which defendant told him he was taking at the time of his arrest, was a very dangerous drug to take with alcohol. He subsequently testified that combinations of large amounts of alcohol and Actifed could cause delusions and hallucinations.

On cross-examination Sellers admitted that he had not consulted the police or the assistant State's Attorneys who had seen the defendant the night of his arrest. Sellers was recalled by the State and was asked about a hypothetical person who showed no symptoms of toxic brain syndrome from early morning until evening, when a statement from him was transcribed. This person had earlier given inculpatory and exculpatory statements. He was able to make written corrections of the written statement, and he initialled every page. Sellers was also given defendant's statement to read. Sellers testified that he would conclude that the hypothetical person was not suffering from toxic brain syndrome or acute intoxication. Sellers specifically noted that a person suffering from either of these conditions would not be able to

sign the signature he saw (on the defendant's statement) unless he had been given medication or alcohol to prevent withdrawal symptoms.

In rebuttal at the hearing, the State introduced the testimony of Detective James Higgins. On January 24, 1980, at about 9 a.m., he met with the defendant for about one-half hour at Area 3 Homicide. He again questioned the defendant at about 3 p.m. and 5 p.m. At 6:40 p.m. a written statement was obtained. Prior to all of these interviews, defendant was informed of his *Miranda* rights. At about 9 p.m. defendant read a transcription of his statement. He made spelling corrections and at one point changed "shooting" to "stabbing." Defendant initialled every page and signed the last page.

According to Higgins, defendant was not handcuffed except at the start of the first interview. His speech was not slurred, and he displayed no lack of coordination. When taken to the bathroom, he walked normally. He showed no signs of nausea, no hand tremors, and had no difficulty focusing his attention. He spoke in a regular voice and gave responsive and coherent answers. He did not complain of any delusions or hallucinations.

Higgins denied striking defendant or making any promises to him. He noted no bruises on defendant's forehead. Higgins also denied telling defendant any of the details contained in the statement. Just before the 5 p.m. interview, he had shown defendant photographs of the knife found in the area of the murder.

Higgins identified a photograph taken at 7 p.m., after the written statement was obtained. It depicted defendant eating a pizza; apparently no marks were visible on defendant's forehead. On the blackboard behind the defendant was the phrase "Need a friend, call a cop." Defendant had told Higgins he wrote this statement.

At the conclusion of the hearing the trial court found that the arrest was based on probable cause and was not a pretext arrest. The court also found that the statements in the car, made while the defendant was under custodial arrest but before he had been informed of his *Miranda* rights, were "not volunteered" and therefore should be suppressed. However, the court found that the subsequent statements were admissible in that defendant had voluntarily and knowingly waived his *Miranda* rights, and the statements were not the result of physical or psychological coercion.

At trial, the State established that Cathy Trunko was found lying on the sidewalk at 4938 South Paulina at about 10:30 p.m. on January 19, 1980. She was breathing faintly and there was blood all over her chest and arm as well as on the sidewalk next to her. She later succumbed to her wounds, which the examining pathologist described as

two stab wounds to her left breast and one to her right breast, all of which penetrated her heart and lungs. She also had abrasions on her chin, left arm, and left knee.

No trail of blood was found at the scene. However, the victim was fully clothed, with her upper body clad in a bra, blouse, sweater, and jacket, and the examining pathologist testified that the blood could have been absorbed by this clothing for a period of time before leaving any exterior trace. Two days later, a kitchen knife was found stuck in the ground near a gangway and sidewalk of a house at 5036 South Hermitage (the street one block west of Paulina). Blood stains on the blade matched the victim's blood type. The pathologist testified that the stab wounds could have been made by that knife. A photograph of the knife imbedded in the ground was taken that same day (January 21, 1980) by the police.

Officer Bednarkiewicz testified to essentially the same facts concerning defendant's arrest as he had at the hearing. At the defendant's house in the early morning hours of January 24, 1980, defendant's mother told Bednarkiewicz that defendant was in a mixed-up state, coming in and out of the house shouting and threatening people. Bednarkiewicz did not testify about defendant's statements in the police car, statements which the trial court had suppressed, but he did testify that after being given his rights at the police station, and after answering routine booking questions the defendant stated, without prompting, "I stabbed her." Bednarkiewicz asked "Who?" and defendant said "Cathy." On further questioning, defendant said he stabbed her twice on one side and once on the other, indicating the breast area. He said he threw the knife on Hermitage. At about 3 a.m. defendant was taken to Area 3 Homicide police headquarters.

Investigator John Olson and two other investigators questioned defendant at Area 3, and he told them that on the night in question he had a fight with his parents and at 9 p.m. drove to the Red Mist Tavern. He stayed there till closing time and then drove to the home of Barbara Magg. However, when asked why he threw the knife away, defendant said they would never find it. Detective Higgins subsequently testified that he was with the defendant on and off from about 9 a.m. until 9 p.m. and had several conversations with him during that time.

Assistant State's Attorney Glenn Sechen testified that he interviewed the defendant at Area 3 at about 5 p.m. Defendant was informed of his rights, said he understood them and that he did wish to speak to Sechen. They spoke for an hour, and Sechen then summoned a court reporter who transcribed defendant's statement after defend-

ant was again given his rights.

Sechen testified he saw no mark on defendant's forehead and defendant did not complain of any mistreatment. He found defendant to be responsive and rational in answering questions. Sechen sat three feet away from the defendant, did not smell alcohol on his breath, and concluded that defendant was not drunk. During the questioning defendant was given food, something to drink, and was allowed to use the bathroom.

In the written statement defendant stated that at about 10 p.m. on January 19, 1980, he was "horny," needing sex. He had drunk four beers, three peppermint schnapps, and three shots of brandy. He obtained a knife from a toolbox in the attic of his home, placed it in his boot, and walked outside. Near the intersection of 51st and Paulina he saw Cathy Trunko, whom he had known for 12 years. He "watched her ass" and then obtained some gloves from his car because he did not wish to be caught.

Defendant caught up with Cathy and struck up a conversation with her. She stopped at her home at 5006 South Paulina, saying she had to give her mother some cigarettes, and then returned. They walked north to Nativity Church at 50th and Paulina. Defendant told Cathy to sit on some steps while he went behind the church to urinate. Out of her sight he placed his knife on some stairs near the sidewalk. He put on his gloves and returned to Cathy, walking with her in the direction of the stairs.

On the pretext of removing a stone from his boot defendant reached down and picked up the knife, holding it at his side while he put his arm around Cathy. He kissed her, told her he loved her, and said he wanted to make love to her. She refused and he forced her down the stairs. He forced her to the ground and lay on top of her, fondling her. She spit in his face and threw him off, running two steps before he pulled her back. To keep her from screaming he held one hand on her throat. When he released her throat she began screaming again and he stabbed her once in each breast and "once in the middle."

Defendant stated that Cathy bled only a little bit and was crawling. He ran through an alley and over to Hermitage, where he discarded the gloves. He also threw down the knife and it stuck in the grass. When shown the photograph of a knife stuck in the ground, defendant confirmed that it depicted the location where he threw the knife and the position of the knife.

Howard Regenbogen, an assistant State's Attorney at the time of the investigation, testified that at about 9:30 p.m. he had defendant

read the statement and correct it. Defendant initialled every page and made a number of spelling corrections. He then signed the statement. Regenbogen testified that defendant appeared to have no difficulty understanding what was taking place or speaking. He did not complain of any mistreatment, and there were no marks or cuts on his face. At one point he started shaking and appeared nervous.

The victim's mother testified that on January 20, 1980, at 8 a.m. the defendant came to her home. He told her that the best girl in the neighborhood had "gotten it." He also said he had been turned down by Cathy for dates and that "she had a nice ass and wouldn't give it up." She admitted on cross-examination that she had not mentioned this to the police when they had questioned her during the investigation. She also testified that she did not smoke cigarettes.

Defendant took the stand and denied having attacked or killed the victim. On the night in question, he testified, he left his house at 9:30 and went to Daniel Manobianco's house for 1 to 1½ hours. At 11:15 or 11:30 p.m. he went to the Red Mist Tavern, where he drank several beers and then went to Wendy Magg's house. It was then that he learned from someone named Andy that Cathy had been killed. Defendant remained at Magg's home until dawn, when he went to the Trunko home to offer his help. He denied making the statement attributed to him by Mrs. Trunko.

Defendant testified that on January 15, 1980, he began taking Actifed for a sore throat. The last time he took it was the day before his arrest at 9:30 p.m. or between 5 and 6 p.m. (he testified to both times). That same evening, January 22, he was stopped by the police for running a red light. He had been drinking, and the police took him home because he was in no condition to drive. His parents spent most of the night talking to him about his drinking and other behavior, and he only slept for about three hours.

At noon the next day he and Norman Venegas drank a six-pack of beer together. Defendant did not remember what occurred in the afternoon. That evening he again was drinking with Venegas, this time at the Red Mist Tavern. Because defendant was in no condition to drive, Venegas drove his car home and defendant got a separate ride home. As he arrived at his house he was drunk, tired and sick.

Defendant arrived home to find police in front. They frisked him and asked where the gun was. One officer began twisting his arm and other officers began to question him about the murder, suggesting he might have committed it. They twisted his arm and roughed him up for 15 to 20 minutes. He was repeatedly kicked on the back of his thighs and knees.

Defendant was then taken to the police station, where the officers elicited booking information from him. At his request he saw Officer Riley for a few minutes. Riley told him to calm down, but then left and other officers began to question him about the murder. Both of defendant's hands were handcuffed behind his back to a locker. He repeatedly requested water but was not given any. He continued to deny any knowledge of the murder.

Defendant was next taken to Area 6 police headquarters. There he told police he had been with Betsy and Mary. This was apparently a reference to some of the people he was with at Wendy Magg's house, the location where he claimed he was when informed of the murder of Cathy. The police told him they would investigate this alibi. Defendant agreed to their request to tell them what he knew about Cathy. He was shown photographs of what police identified as the murder weapon, including one photograph that depicted the knife stuck in the ground next to a pair of gloves. Defendant also recalled that when he first arrived at Area 6 he was questioned by three officers who beat him for about two hours. This beating included slaps, kicks, punches, and blows from either a flashlight or a nightstick. Defendant told these men that he knew that Cathy had argued with someone named Bob the night before her murder. (Defendant also testified that someone named Dennis Donat had told him he thought Bob killed Cathy.)

When the officers who beat defendant left, Detective Higgins arrived. Defendant informed Higgins of the beating. Higgins told him he would protect him if he cooperated but otherwise he would let the officers return. Defendant contended that he never confessed to Higgins. Rather, Higgins told him to pretend he was the killer and then discuss how the act might have been accomplished. A statement was developed in this fashion, with Higgins suggesting what defendant should say. Higgins also had defendant draw a neighborhood map and had defendant mark the location where Higgins said the knife had been found.

Defendant testified that he continued to maintain his innocence, but Higgins threatened to call in the officers who had beaten him if he did not convince Higgins' "boss" (Assistant State's Attorney Sechen) that he had killed Cathy. Higgins also promised to get the defendant a job, to be his friend, and to go boating with him. They then rehearsed the "script" they had prepared. Defendant was given a piece of pizza and it was at this time that he wrote "Need a friend, call a cop" on the board because he considered Higgins to be his friend. After being advised of his rights (which he testified he understood), defendant then repeated to Sechen the story he and Higgins had concocted.

Defendant recalled that the questioning by Higgins had lasted about 20 hours. During this time he was given no water or food (except the pizza). He was also not allowed to visit the bathroom and had to urinate into a wastebasket in the interrogation room. The beating he received caused bruises on his chest and back of his legs. A photograph taken at the jail hospital depicted an injury to his forehead which he also said resulted from the beating. On cross-examination the defendant stated that he was examined while nude prior to his admission to the jail. The State introduced an examination report which indicated the absence of bruises or lacerations on his chest or forehead. Scars on his forehead and stomach were identified as the results of an old automobile accident and an operation. Bruises were noted on his wrists.

Defendant's sister Julie testified that on the night of the murder defendant left home at about 9:15 and did not return that night. He had a bottle of beer in his hand but she did not know whether or not he was sober. She had never before seen the knife that was found on Hermitage. At the family home, the only tool boxes were in the basement and on a landing. Neither box contained a knife.

Daniel Manobianco, who had known the defendant for 10 years, testified that on January 19, 1980, defendant came to his apartment at 2152 West 50th between 9:30 and 10 p.m. They played cards for three hours. On cross-examination, Manobianco admitted that he had not revealed this alibi information for two years. He explained that when he heard of defendant's arrest he did not come forward because he had heard that defendant had confessed.

Wendy Magg testified that on the night of the murder she returned to her home at about 12:30 a.m. to find defendant there with a group of people including Andy Gladkowski, Mary Gladkowski, and Betsy Lignal. Andy told her that Cathy had been killed that night. The night of Cathy's wake she again saw the defendant. He appeared to be upset or angry and was drunk.

Cathy Trunko's best friend, Diane Diaz, testified that on the night of the murder, at 10 p.m., she was at Dot's Tavern with Bob Legace. She spoke to Cathy by telephone for about 25 minutes. As she spoke to Cathy, Bob Legace left. He came back in 15 to 20 minutes, sweating and carrying several $20 bills and a $10 bill. Diaz had not seen him with any money before he left.

Norman Venegas gave substantially the same testimony as at the suppression hearing. He again testified that defendant was drunk when he saw him at the police station. However, he added that defendant spoke to him there, telling him to tell the police the truth and

everything that happened.

Defendant's mother testified at trial to substantially the same account of the arrest of her son. She admitted telling Officer Bednarkiewicz that defendant was mixed up, running around, and shouting at everyone. She also testified that defendant took medicine for his sore throat on the 15th and 16th but not on the 19th. In the early morning hours of January 26, 1980, she and her husband visited the defendant at the Ninth District police station. On defendant's forehead was a gash or cut that was not there when he was arrested.

Officer Michael Riley testified that the day of defendant's arrest defendant's mother called him to report that defendant was intoxicated and she was afraid of what he might do. He also received a call from defendant's brother, who apparently told him defendant was driving a silver Pinto and might be carrying a weapon. He gave this information to Officer Bednarkiewicz. Riley saw defendant at the police station about 10 minutes after he was brought in. He believed defendant to be highly intoxicated. He could not smell alcohol on him, but his opinion was based on the fact that defendant could not speak rationally and was mumbling. Riley told the defendant to calm down and he did so. Defendant did not complain of mistreatment, and Riley saw no gash on his forehead.

Father Boller testified that when he saw the defendant at the hospital section of the jail on January 26, 1980, defendant's wrists were red and swollen and his forehead was bruised. Defendant was incoherent at times, and his hands were shaking.

Dr. Sellers testified that he was familiar with the possible side effects of Actifed, which included hallucinations and delusions. These could last 8 to 12 hours, and, if taken with large amounts of alcohol, the side effects could be enhanced and could last up to 13 hours. On cross-examination Sellers stated that only a small percentage of the population would experience these side effects.

In rebuttal, Investigator John Olson, who had interviewed the defendant at about 3 a.m. following his arrest, testified that defendant had failed to mention Daniel Manobianco when telling the officers his alibi. Defendant told them someone named Bob killed Cathy and that he knew 20 people who knew this, although he did not name any. In Olson's opinion defendant was not drunk at the time of the questioning.

Detective Higgins denied that he had promised defendant anything or coached him about what to say. He saw no cuts on defendant's forehead and had no knowledge of any beating received by the defendant. Higgins confirmed that he had been with the defendant intermittently

from 9 a.m. to 9 p.m. on the day in question.

In surrebuttal Betty Wasson, a former employee of defendant's counsel, testified that on January 27, 1980, she saw bruises and lumps on the defendant's chest and a gash on his forehead when she visited him at the hospital.

## I

We first consider defendant's contention that all his statements to the authorities following his arrest should have been suppressed. In reviewing this contention, we are mindful that we may utilize the evidence adduced at trial as well as that adduced at the suppression hearing in making our determination. *People v. La Bostrie* (1958), 14 Ill. 2d 617, 153 N.E.2d 570, *cert. denied* (1959), 359 U.S. 947, 3 L. Ed. 2d 680, 79 S. Ct. 728; *People v. Caballero* (1984), 102 Ill. 2d 23, 464 N.E.2d 223, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 298, 105 S. Ct. 362.

We find no merit to defendant's contention that his arrest was made without probable cause. The evidence establishes that the police had been told by members of defendant's family that he was driving while intoxicated and might be in possession of a weapon. When he was located he was searched for weapons and briefly detained outside his home while one officer spoke to his mother. Clearly the officers possessed sufficient articulable facts to justify this brief detention of the defendant while they investigated further. (*United States v. Sharpe* (1985), 470 U.S. ___, 84 L. Ed. 2d 605, 105 S. Ct. 1568; *People v. Smithers* (1980), 83 Ill. 2d 430, 415 N.E.2d 327.) When the police were then told by defendant's mother that he had been shouting and threatening people in the house, they possessed ample probable cause to arrest him based on her disorderly conduct complaint.

Defendant asserts that, because he was intoxicated, the police were required by law to take him to a detoxification center under protective custody. Section 512 of the Alcoholism and Intoxication Treatment Act (Ill. Rev. Stat. 1983, ch. 91½, par. 501 *et seq.*) does provide for such treatment for intoxicated persons found to be incapacitated in public places. But defendant fails to recognize that the Act also provides that intoxicated persons who also violate criminal laws remain liable for prosecution for such acts. Ill. Rev. Stat. 1983, ch. 91½, par. 518(c).

We next consider defendant's contention that his state of intoxication prevented him from knowingly waiving his *Miranda* rights. The question of intoxication was discussed at some length by the trial court in denying defendant's motion to suppress. The court noted that

defendant's witnesses had varied in their descriptions of the degree of defendant's intoxication. Some of them admitted that they had not actually seen defendant consume any alcohol or had only seen him consume one drink. The court also noted that the testimony established that the defendant was able to walk without difficulty and was coherent. Based on its assessment of the credibility of the witnesses, the court concluded that defendant had been capable of appreciating and understanding the full meaning of his rights and had in fact voluntarily, intelligently, and knowingly waived those rights after being advised of them at the police station.

The fact that a defendant is under the influence of drugs or alcohol when he confesses does not automatically render that confession inadmissible. (*People v. Kincaid* (1981), 87 Ill. 2d 107, 429 N.E.2d 508, *cert. denied* (1982), 455 U.S. 1024, 72 L. Ed. 2d 144, 102 S. Ct. 1726.) Suppression is warranted when the evidence clearly demonstrates that because of his condition the defendant lacked the capacity to waive his rights, but when the proof is less clear the evidence of a defendant's drugged or intoxicated condition merely goes to the weight to be given to the defendant's confession without barring it altogether. (*In re Shutters* (1977), 56 Ill. App. 3d 184, 370 N.E.2d 1225; *People v. Moon* (1976), 38 Ill. App. 3d 854, 350 N.E.2d 179.) Thus, in *People v. Dagge* (1973), 10 Ill. App. 3d 726, 295 N.E.2d 336, where the defendant produced evidence that he was intoxicated and experiencing delusions, his statements were nonetheless found to be admissible based on evidence of his normal gait, unslurred speech, awareness of the charges, and his ability to give detailed and intelligent responses to questions.

In this cause, although the arresting officer testified that he had indicated on the arrest report that defendant was intoxicated, he also testified that after defendant was arrested and transported to the police station defendant was coherent and gave understandable responses to his questions. One of the officers who questioned the defendant several hours after his arrest, Investigator Olson, testified that defendant did not then appear to be drunk. Detective Higgins, who was with the defendant intermittently from 9 a.m. until 9 p.m. on the day in question, testified that defendant's speech was not slurred, hs gait was normal, he showed no sign of experiencing hallucinations and gave responsive and coherent answers to questions. It is evident that the trial court chose to believe this testimony rather than that of defendant's witnesses. We find no basis for overturning that credibility determination.

As defendant notes, the trial court did suppress the admissions made by defendant in the squad car prior to being informed of his

*Miranda* rights. The trial court stated that the statements were made while defendant was in custodial arrest, were "not volunteered statements," and that defendant had not knowingly waived his *Miranda* rights when he made the statements.

■ It is defendant's contention that these findings must mean that the court believed defense testimony that defendant was immediately questioned about the killing at the scene of his arrest. Defendant also suggests that the court implicitly determined that defendant was questioned about the killing while in the squad car, even though there was no direct testimony that this occurred. However, we conclude upon our review of the record that the trial court believed the police testimony that defendant was not questioned about the killing prior to making the admissions at issue. As we have noted, the trial court clearly believed the State's witnesses on the question of the degree of defendant's intoxication. The court also expressly noted the contradictions in the defense witnesses' accounts of what occurred at the scene of the arrest:

> "[O]ne witness indicated that [defendant] was being held over the top of a van. Another witness indicated that he was being placed with his hands over the hood of a car—hood of the police car. And the other witness indicated that he was being held with his hands over the—it would be the top of the police car, but covering the windows to the back. There's an indication they could hear everything that was being said, even though the windows were rolled up in the squad car. There was even testimony from the defendant's mother that the windows were rolled up in the squad car, but she still could hear Norman [Venegas] hollering from the rear of the squad car, which she placed quite a distance from her home, which all goes to the credibility and the weight the Court had to give the testimony adduced."

Based on these findings, it would appear that the trial court suppressed defendant's admissions in the squad car not because the court believed defendant had been questioned about the killing, but merely because those statements were made while in custody and without having been advised of his *Miranda* rights. We do not concur with this legal conclusion.

Even if a suspect is under arrest, his volunteered statements are admissible, and the police are not required to interrupt a suspect in the process of making a volunteered statement in order to inform him of his rights. (*People v. Lang* (1982), 106 Ill. App. 3d 808, 436 N.E.2d 260; *People v. Baer* (1974), 19 Ill. App. 3d 346, 311 N.E.2d 418.) Even where a volunteered statement is amplified by the defendant in re-

sponse to limited follow-up questioning, the courts have in some instances found the resulting admissions to be admissible. Thus, in *People v. Mattison* (1971), 132 Ill. App. 2d 1069, 271 N.E.2d 119, the defendant was arrested and not properly informed of all his *Miranda* rights. While being taken to the police station the defendant initiated a conversation with a State narcotics agent. The defendant stated that he had sold baking soda to two men in a blue car. The agent admitted that he then questioned the defendant about the age of the men. The court held that the defendant's statements were volunteered despite the failure to properly advise him of all his rights. Even though the record revealed that after the defendant initiated the conversation he was asked some questions, the court found the statements were not the result of in-custody interrogation. In *United States v. Garza* (7th Cir. 1981), 664 F.2d 135, *cert. denied* (1982), 455 U.S. 993, 71 L. Ed. 2d 854, 102 S. Ct. 1620, two escaped prison inmates were captured in a gun battle with the authorities. While at a hospital recovering from wounds incurred in that battle, one inmate was visited by an FBI agent and a State laboratory examiner. The defendant inmate asked the agent what the examiner was doing there. The agent told him, "He's going to run a test on your hands to see which hand you used to fire the gun when you shot the sheriff." The defendant initially turned away without comment but then said that it was his right hand. The agent then asked if he was right-handed or left-handed. The defendant said he was both. As the examiner continued with his testing, the defendant said this was unnecessary because he had told them it was the right hand. The court held that these statements were properly admissible as volunteered despite the lack of *Miranda* warnings because it was the defendant who initiated the conversation. However, in *People v. Clark* (1980), 84 Ill. App. 3d 637, 405 N.E.2d 1192, the court found it improper for the police, who had been engaging in general on-the-scene questioning of the wife of a shooting victim, to isolate her in a squad car and question her at length, without any *Miranda* warnings, after she said that she had shot her husband.

In this cause, the defendant was arrested and transported in a squad car to the police station for processing on a charge of disorderly conduct. The police twice asked him about a weapon because of reports that he had one, but he denied having one. There was then a lull in the conversation; nothing was said until the five-minute ride was completed and the car reached the police station. Defendant then stated, without prompting, "I killed her." We have concluded that the trial court found credible the police testimony that up to this point defendant had not been questioned at all about Cathy's murder. When faced

with this statement one officer asked "Who?" and defendant responded "Cathy." No further questioning took place until after the defendant was advised of his *Miranda* rights. Under these circumstances, we conclude that the defendant's statements were properly admissible as volunteered despite the failure to initially inform him of his rights. Nor do we find the single clarifying question by the police to constitute such extended questioning as would require suppression of defendant's response. Accordingly, we hold that the trial court erred in suppressing these statements. Because of this finding, we need not address defendant's contention that subsequent statements made by the defendant were tainted by these statements.

## II

■ Defendant has also contended on appeal that the admissions in the squad car were improperly introduced at trial when Officer Bednarkiewicz testified that precisely the same statements were made by defendant after he was advised of his *Miranda* rights at the police station. Defense counsel never cross-examined the officer concerning this apparent change from his suppression-hearing testimony, and thus counsel can only present us with speculation concerning the cause for this revised testimony. In any event, we find no prejudice arising from this evidence given our determination that the statements, even if made only prior to the giving of *Miranda* rights, should not have been suppressed.

## III

■ Prior to trial the court granted the State's motion to bar any testimony concerning defendant's history of alcoholism. The court ruled that any evidence concerning defendant's condition at the time of the incident in question (including his arrest) would be allowed. As an offer of proof the defendant proffered all the suppression-hearing testimony concerning his problems with alcohol. Defendant contends that he was prejudiced by this ruling.

The trial court is given broad discretion in ruling on issues of relevancy and materiality. (*People v. King* (1978), 61 Ill. App. 3d 49, 377 N.E.2d 856.) The record indicates that prior to trial defense counsel had contemplated an insanity defense linked to defendant's alleged alcoholism. However, by the time of trial this defense was abandoned, and defendant's problems with alcohol were relevant only insofar as they pertained to his condition at the time of the statements he made to the police. Defendant was permitted to fully adduce testimony concerning his condition at the time of his arrest and during the ensuing

police questioning. We find no error in the trial court's ruling on this issue.

## IV

■ We finally consider defendant's contention that his guilt was not established beyond a reasonable doubt. Defendant asserts that the only evidence against him was his confession. Under Illinois law, the corroboration necessary to sustain a conviction based on a confession is supplied by proof of the *corpus delicti*. (*People v. Willingham* (1982), 89 Ill. 2d 352, 432 N.E.2d 861.) In a murder case, the *corpus delicti* consists of the fact of death and the fact that death was caused by the criminal agency of some person. (*People v. Holmes* (1977), 67 Ill. 2d 236, 367 N.E.2d 663.) The test of evidentiary sufficiency in such cases is whether the evidence establishes that a crime was committed and that the accused committed it. *People v. Perfecto* (1962), 26 Ill. 2d 228, 186 N.E.2d 258; *People v. Raseaitis* (1984), 126 Ill. App. 3d 600, 467 N.E.2d 1098.

In this cause it is undisputed that Cathy Trunko's death was caused by the criminal agency of some person. The defendant gave a very detailed account of the manner in which he had killed Cathy. The physical evidence corroborated this confession. Defendant admitted stabbing Cathy three times in the chest, and the pathologist's testimony confirmed these wounds. Defendant also stated that when he left Cathy she was still able to crawl; the witnesses who found her confirmed that she was still alive. Also, the defendant stated that he threw the knife to the ground on Hermitage, where it stuck in the grass. A knife with blood stains matching Cathy's blood was found imbedded in the ground near Hermitage. Given these corroborating circumstances, we find that defendant's guilt was established beyond a reasonable doubt.

The judgment of the trial court is affirmed.

Affirmed.

JIGANTI, P.J., and LINN, J., concur.