Daniel ANDERSEN,
Petitioner–Appellant,

v.

James THIERET, Warden,
Respondent–Appellee.

No. 89–1574.

United States Court of Appeals,
Seventh Circuit.

Argued April 3, 1990.

Decided June 5, 1990.

As Amended June 11, 1990.

Frank C. Lipuma, Mayer, Brown & Platt, Chicago, Ill., for petitioner-appellant.

Nathan P. Maddox, Asst. Atty. Gen., Office of the Atty. Gen., Criminal Appeals Div., Springfield, Ill., for respondent-appellee.

Before WOOD, Jr., EASTERBROOK and MANION, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Daniel Andersen brings this habeas petition to challenge his incarceration at the Menard Correctional Center in Menard, Illinois. Andersen alleges that his confession to these crimes was not voluntary and that the state trial court violated his *Miranda* rights by admitting into evidence certain statements he made shortly after his arrest. The district court denied Andersen's petition and we affirm.

## I. FACTUAL BACKGROUND

On the night of January 19, 1980, Cathy Trunko was stabbed in the chest three times near her home in Chicago, Illinois. Only her assailant witnessed the attack. A passerby found Cathy lying on the sidewalk, covered with blood. By the time she was found, medical assistance was no help, and Cathy eventually succumbed to her wounds. An Illinois state trial court convicted petitioner Andersen of attempted rape and murder in connection with this attack and sentenced him to concurrent thirty and fifty-five year sentences. On direct appeal, the Illinois Appellate Court affirmed Andersen's conviction, and that court's decision contains a full narrative of the crime and Andersen's arrest. *See People v. Andersen*, 134 Ill.App.3d 80, 82–94, 479 N.E.2d 1164, 1166–74, 89 Ill.Dec. 158, 160–68 (1985). A less-detailed version of the facts is necessary to an understanding of this case.

The voluntariness of the petitioner's confession predominates the issues in this appeal. After his arrest, Andersen told the following story to the police. At about 10:00 P.M. on January 19, 1980, he had been drinking and felt a need for sex. Andersen obtained a knife from a toolbox in the attic of his home, placed it in his boot, and walked outside. He saw Cathy Trunko, a woman he had known for twelve years. Not wishing to be caught for the crime he was contemplating, Andersen went to his car and got a pair of gloves.

Next, Andersen came alongside Cathy and struck up a conversation. When they

passed her home, Cathy informed Andersen that she had to go inside for a moment to give her mother some cigarettes. She came back outside, and they resumed their walk. In front of a church, Andersen told Cathy to wait on the front steps while he went around back to urinate. When out of her sight, he took the knife from his boot and placed it on some stairs where he could reach it from the sidewalk. Andersen put on his gloves and returned to Cathy, walking with her toward the stairs.

When they got close enough to the stairs, Andersen bent down and picked up the knife. He put his arm around Cathy, kissed her, and said he wanted to make love. She refused. He forced her to the ground and fondled her. Cathy spit in his face. She tried to escape and started to scream. Andersen then thrust the knife into her chest, once in each breast and "once in the middle." As he fled, Cathy was crawling on the ground. Andersen then discarded his knife and gloves, but the knife was later recovered by the police in an area that Andersen agreed was the place he had thrown it.

This was the story that Andersen related five days later, on January 24, 1980, after his arrest for disorderly conduct. Petitioner's mother had asked her friend, Officer Riley, to bring the defendant home as he was drunk, had a weapon, and was driving his silver Ford Pinto. Riley passed this information along to another police officer who soon spotted the silver Pinto. This second officer stopped the car, but the defendant was not in it; a friend had agreed to drive it because Andersen was too drunk to drive. The officers and the friend then proceeded to the mother's house. They saw the defendant walking toward them. The police searched Andersen but found no weapon. One of the officers asked the defendant's mother if she wanted the defendant left with her or taken to the station. She said the defendant had been causing a disturbance so she signed a disorderly conduct complaint against him.

Nothing in the record suggests that at this point, the police suspected Andersen of the Trunko murder, but he soon provided them with a reason to do so. During the five-minute ride to the police station, there was some conversation about the weapon that the defendant's mother said he had, but the defendant denied he had one, saying he was just out drinking. After an interval of silence, Andersen then blurted, "I stabbed her"; the arresting officer asked, "Who?"; and Andersen responded, "Cathy." At the suppression hearing before the state trial court, the arresting officer testified that this exchange occurred before Andersen was read his *Miranda* rights, but at trial the same officer testified that the statement was made after *Miranda* warnings. Although the state trial court suppressed any statements made before *Miranda* warnings, this colloquy was allowed into evidence consistent with the testimony at trial and on the basis that it occurred after *Miranda* warnings.

After Andersen was read his *Miranda* warnings, he responded that he knew them and that he wished to waive them. The police then questioned him further about the stabbing, and this is when he gave the disputed confession to the police. What happened at the station house is a matter of conflicting evidence. Andersen contended that he was roughly handled and injured by the police, that he was misled by a "good officer" routine, and that his oral and written confessions were involuntary under all the circumstances. The degree of the petitioner's intoxication was also disputed. Some of the petitioner's witnesses said that he was drunk, that he had a chronic alcohol problem, and that he had smoked parts of two marijuana cigarettes. Finally, Andersen contended that his confession was merely a script story, concocted by him and the officer who had promised to be his friend.

The state trial court, based upon the credibility of the witnesses and considering the contradictions in the testimony of the defendant's witnesses, determined that the defendant's confession was voluntary. In oral findings reproduced as an appendix to this opinion, the trial court rejected Andersen's contention that intoxication rendered him susceptible to police suggestions that he confess. His speech was found not to

be slurred; he walked normally, displayed no lack of coordination, had no hand tremors, no difficulty focusing his attention, and gave coherent answers. When the defendant reviewed a draft of his written confession, he had the presence to change the word "shooting" to "stabbing." Similarly, the trial court found that no physical coercion had occurred. In sum, the state trial court rejected Andersen's evidence.

Both parties consented to the entry of a final judgment on the habeas petition by a United States magistrate. Relying on the factual findings of the state trial court, the magistrate did not conduct an evidentiary hearing. The magistrate concluded that Andersen had not shown his confession was involuntary, rejected Andersen's *Miranda* claims, and denied the petition. Andersen now appeals that decision pursuant to 28 U.S.C. §§ 636(c)(3), 1291.

## II. DISCUSSION

### A. *Voluntariness of Confession*

■ The threshold issue is the correct standard for reviewing the magistrate's decision on the voluntariness of Andersen's confession. As a habeas petitioner, Andersen is entitled to a federal district court's de novo review of the voluntariness issue under *Miller v. Fenton*, 474 U.S. 104, 112, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985), and we have interpreted *Miller* to require de novo appellate review of the district court's decision on voluntariness, *see United States v. Hawkins*, 823 F.2d 1020, 1022–23 & n. 1 (7th Cir.1987). This standard of review has recently come under attack, *see, e.g., United States v. Rutledge*, 900 F.2d 1127, 1128–29 (7th Cir.1990); *Weidner v. Thieret*, 866 F.2d 958, 961 (7th Cir.1989); *Sotelo v. Indiana State Prison*, 850 F.2d 1244, 1253–55 (7th Cir.1988) (concurring opinion), and even replaced by an abuse of discretion standard when we exercise discretionary jurisdiction under 28 U.S.C. § 636(c)(5), *see Wilson v. O'Leary*, 895 F.2d 378, 383 (7th Cir.1990). Nevertheless, because an ultimate resolution is not necessary for our decision, we will follow the example of *Sotelo* and leave the question for another day. 850 F.2d at 1247 n. 4; *see*

*also Rutledge*, 900 F.2d at 1129 (declining to decide question where litigants did not challenge the correct standard of review). Therefore, we will review the magistrate's decision on voluntariness de novo.

■ Before considering the substance of Andersen's petition, we must pause because the state trial court's choice of words complicates our decision. Where the state trial judge orally stated that he believed none of Andersen's statements "were obtained as a result of" possible police misconduct, he could have been clearer. A rhetorician might quibble with this language; saying that something is not "the result of" a sequence of events is not literally the same as saying the sequence of events did not occur. *Cf. Weidner*, 866 F.2d at 960, 964 (granting evidentiary hearing to habeas petitioner to clarify state trial court's findings that no threats or coercion had "induced" the confession). But a state trial court's findings on voluntariness need not be talismanic, especially where the findings are rendered orally. In this case, the state trial judge carefully surveyed the evidence that had been presented, considered the credibility of the witnesses, and then rendered his findings. The state trial judge's findings manifest his clear intent to repudiate Andersen's excuses for his confession. That is enough for us to easily infer the underlying factual findings he must have made. His findings are adequate.

■ Turning to the merits, we must presume correct subsidiary factual findings of the state courts. 28 U.S.C. § 2254(d). Before this presumption can arise, the state court must have resolved the merits of a factual dispute. *Id.* § 2254(d)(1). In essence, subsection 2254(d)(1) of the habeas statute merely codifies the self-evident proposition that a state court must have made a finding on a particular factual issue before a federal court can defer to that finding. *See Townsend v. Sain*, 372 U.S. 293, 313–14, 83 S.Ct. 745, 757–58, 9 L.Ed.2d 770 (1963). A federal court, however, is not limited to express factual findings made by the state court; it must also rely on any resolution of factual disputes that

can be fairly inferred from the state court record. *See LaVallee v. Delle Rose*, 410 U.S. 690, 694–95, 93 S.Ct. 1203, 1205–06, 35 L.Ed.2d 637 (1973); *Townsend*, 372 U.S. at 314–15, 83 S.Ct. at 757–58. For example, where a habeas petitioner's story would have led the state trial court to conclude the petitioner's confession was involuntary, the state court's finding of voluntariness implies that petitioner's version of the facts was rejected. *See LaVallee*, 410 U.S. at 692–93, 93 S.Ct. at 1204–05. (habeas petitioner alleged police brutality and torture).

■ We think this is a similar case; the state trial court's discussion of the evidence and its conclusion that Andersen's confession was voluntary is fairly interpreted as a rejection of his version of the facts. In the absence of evidence to the contrary, we must assume that the state courts applied the correct constitutional standards to this case. *Townsend*, 372 U.S. at 314–15, 83 S.Ct. at 757–58. If the state courts had credited his story, these standards would have required them to conclude that Andersen's confession was involuntary. The physical abuse that Andersen claims occurred would have led to a finding of involuntariness. *See, e.g., Stein v. New York*, 346 U.S. 156, 182, 73 S.Ct. 1077, 1091, 97 L.Ed. 1522 (1953) (When physical violence is present, "there is no need to weigh or measure its effects on the will of the individual victim."); *Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936) (confession involuntary where defendant was whipped); *see also* 1 W. LaFave & J. Israel, Criminal Procedure § 6.2(c) (1984) (collecting cases). Food, sleep, and water deprivation and a mentally coercive interrogation would also have caused the state courts to conclude that Andersen's confession was involuntary.[1] *See, e.g., Brooks v. Florida*, 389 U.S. 413, 88 S.Ct. 541, 19 L.Ed.2d 643 (1967) (deprivation of food and water, combined with conditions of confinement, made confession involuntary); *see also Colorado*

*v. Connelly*, 479 U.S. 157, 163 n. 1, 107 S.Ct. 515, 520 n. 1, 93 L.Ed.2d 473 (1986) (collecting cases); 1 W. LaFave & J. Israel, Criminal Procedure § 6.2(c) (1984) (collecting cases). Because Andersen alleged the police's use of "third-degree methods" and the state trial court refused to exclude the confession from evidence, we may assume the state court found the "facts against the petitioner, the law being, of course, that third-degree methods necessarily produce a coerced confession." *Townsend*, 372 U.S. at 315, 83 S.Ct. at 758.

We need not rely exclusively on our own inferences that may be drawn from the state trial court's findings. The Illinois Appellate Court rejected Andersen's plea to find his confession involuntary by saying, "It is evident that the trial court chose to believe [the interrogating officer's] testimony rather than that of the defendant's witnesses." 134 Ill.App.3d at 95, 479 N.E.2d at 1175, 89 Ill.Dec. at 169. Whether a factual finding is made by a state trial or state appellate court is inconsequential; subsection 2254(d) applies a presumption of correctness to both. *See Sumner v. Mata*, 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981). Because the Illinois Appellate Court's statement could be read either as an interpretation of the state trial court's findings or as an independent factual finding that the defendant's witnesses were not credible, we need not base our holding on it. Nevertheless, to the extent this statement can be interpreted as a finding of fact, it provides another reason for our decision.

■ Andersen also urges that the record as a whole does not support the state trial court's findings. *See* 28 U.S.C. § 2254(d)(8). While it is true that the state trial judge never made a finding as to Andersen's specific blood alcohol level at different times, this was hardly necessary. The state trial court's finding necessarily rejected Andersen's claim that he was over-

---

1. The Supreme Court has now made clear that in the absence of coercive police conduct, a criminal defendant's mental state alone cannot make his confession involuntary. *Colorado v. Connelly*, 479 U.S. 157, 163–67, 107 S.Ct. 515,

520–22, 93 L.Ed.2d 473 (1986). Therefore, Andersen's intoxication by itself could not support a finding of involuntariness and is relevant only to the extent it made him more susceptible to mentally coercive police tactics.

borne by a combination of intoxication and coercive police tactics. This finding is hardly illogical given that at least nineteen hours elapsed between Andersen's last drink and his confession. As to Andersen's allegations that he was physically abused and mentally coerced, he admits that he is the only witness. We agree with the Illinois Appellate Court's observation: the state trial court obviously chose to credit the testimony of Andersen's custodians rather than his own. The testimony of these witnesses provides ample support for the state trial court's findings.

■ Andersen has not shown that any of the exceptions in 28 U.S.C. § 2254(d) are applicable, and we must presume the accuracy of the state trial court's factual findings. Because the state trial court rejected Andersen's story of a third-degree interrogation, the record contains no support for a finding that Andersen's confession was involuntary. The police did not arrest Andersen because they suspected him of the Trunko murder. Rather, Andersen was properly arrested on a disorderly conduct charge initiated by his mother, and the police uncovered Andersen's involvement in the murder as a follow-up to surprise statements he made shortly after his arrest. Even reviewing the magistrate's decision de novo, we must find that Andersen voluntarily confessed to the Trunko murder.[2]

B. *Admissibility of Custodial Statements*

■ Andersen and his prosecutors agree that the following exchange occurred while Andersen was in custody:

ANDERSEN: "I stabbed her."

POLICE OFFICER: "Who?"

ANDERSEN: "Cathy."

The parties argue over whether this conversation occurred before or after Andersen was given *Miranda* warnings and whether the admission of this statement violates the dictates of *Miranda.* While the state contends that Andersen waived this argument by not squarely presenting it in his petition for leave to appeal to the Illinois Supreme Court, *see Nutall v. Greer,* 764 F.2d 462, 465 (7th Cir.1985), we find that Andersen sufficiently presented the issue to the Illinois state courts to preserve it for federal habeas review.

At a suppression hearing, the arresting officer testified that Andersen made these statements before *Miranda* warnings, but at trial, the same officer stated that the statements were made after *Miranda* warnings. Although the state trial judge had excluded any of Andersen's statements made before *Miranda* warnings, the arresting officer was allowed to testify as to this colloquy on the basis of trial testimony that it occurred after *Miranda* warnings. However, the timing of this conversation is inconsequential. Even if the statements were made before warnings were given, they could have been properly received into evidence, because Andersen volunteered his initial statement and the arresting officer's reflexive question does not constitute an "interrogation" for purposes of *Miranda.* Therefore, Andersen was not prejudiced by the admission of these statements.

Shortly after his arrest, the police asked Andersen if he had a gun, an arguably proper line of questioning to protect the officers' safety. *See New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). Despite this initial questioning, we agree with the Illinois Appellate Court that Andersen's statement a few minutes later was initially volunteered.

2. At oral argument, we asked whether the magistrate had applied an incorrect quantum of proof in deciding that the petitioner's confession was voluntary. On two occasions in his written opinion, the magistrate stated that the petitioner "must prove beyond a reasonable doubt" that his confession was involuntary. Of course, the correct standard is that the petitioner prove by a preponderance of the evidence that his confession was involuntary. *See United States ex rel.*

*Cross v. DeRobertis,* 811 F.2d 1008, 1015 (7th Cir.1987); *Martin v. Wainwright,* 770 F.2d 918, 925 (11th Cir.), *cert. denied,* 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986). Because petitioner never raised this argument except in response to questions at oral argument, he has waived it. In addition, the magistrate correctly identified the proper quantum of proof in other places in his opinion, convincing us that any prejudice to the petitioner was minimal.

This lapse of time and the nonresponsive character of Andersen's statement removes any possibility that Andersen was responding to police interrogation about a gun when he stated, "I stabbed her." By its own terms, *Miranda* does not apply to volunteered statements, and thus Andersen's first exclamation could be properly received into evidence. *See Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966).

Furthermore, the police officer's responsive question, "Who?," did not require full *Miranda* warnings before its utterance. *See, e.g., United States v. Rhodes*, 779 F.2d 1019, 1032 (4th Cir.1985) (no interrogation occurred where drug dealer saw police officers were confiscating his notebook and said, "You can't take that," to which a police officer responded, "Why" and drug dealer stated, "I can't run my business without that."), *cert. denied*, 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986); *Papile v. Hernandez*, 697 F.Supp. 626, 630–31 (E.D.N.Y.1988) (no interrogation occurred where police officer asked, "What kind of a deal?" in response to habeas petitioner's spontaneous offer, "I want to make a deal."); *Turner v. Sullivan*, 661 F.Supp. 535, 538 (E.D.N.Y.1987) (no interrogation occurred where habeas petitioner had initiated exchange by stating, "My leg is hurting," to which police officer responded, "What happened to you?"), *aff'd*, 842 F.2d 1288 (2d Cir.), *cert. denied*, 487 U.S. 1240, 108 S.Ct. 2913, 101 L.Ed.2d 944 (1988); 1 W. LaFave & J. Israel, Criminal Procedure § 6.7(d) (1984). The police officer's question was a neutral response, intended to clarify Andersen's puzzling declaration; it was not coercive interrogation that *Miranda* seeks to prevent. Therefore, the police officer's question and Andersen's response could have been properly admitted. On the facts of this case, the spontaneous colloquy, which was initiated by the accused, did not require full *Miranda* warnings before it could be admissible.

## III. Conclusion

Andersen has not established an exception to the general rule that we must presume correct the findings of the state trial court, and consequently, there is no basis upon which we can find his confession involuntary. Also, Andersen has not established a violation of *Miranda*. Accordingly, the judgment of the district court denying his petition for a writ of habeas corpus is

Affirmed.

## Appendix

Oral Findings of the State Trial Judge:

All right. The Court has heard extensive evidence, witnesses on the defendant's motion to quash and also, the second motion. The motion to suppress statements has heard arguments of Counsel. And the matter was taken under advisement and continued today's date for the Courts [*sic*] ruling and finding of fact.

The Court will not comment in great detail prior to making the finding of fact, but the Court will comment as to one facet because in the Court's opinion, it is one of the crutial [*sic*] elements as indicated in the motion to quash and also, in the motion to suppress. And that is the defendant's condition at the time of his arrest and at the time of giving the purported statements as to his sobriety or lack thereof.

Different witnesses have testified and most of them have commented on his condition at the time that they saw him. And the comments have been as to the—one witness indicated the word he—his opinion was "drunk." Another one indicated he was "dead drunk." Another one indicated he was "intoxicated." However, upon the particular witnesses being questioned further, as to the basis for their opinion, they then came up with statements as or admissions they had not seen the defendant consume any alcohol.

Some indicated they had seen him consume only one drink. Others indicated the basis of their opinion was merely the fact they smelled the odor of alcohol on his breath, however, they indicated that he was able to drive a car, to walk without stumbling and his speech, although it was raspy, they could understand what he was saying.

And that he was coherent. So, there's a great divergence as to his condition. And the Court must consider the credibility of the witnesses as testified based upon the basis that they indicated for their conclusion that he was drunk or dead drunk or intoxicated, according to the words that were used by the different witnesses that testified.

Although there is contradiction in the record as to the witnesses [sic] statement as to what occurred at the time that the defendant was taken into custody in front of his house; one witness indicated that he was being held over the top of a van. Another witness indicated that he was being placed with his hands over the hood of a car—hood of the police car. And the other witness indicated that he was being held with his hands over the—it would be the top of the police car, but covering the windows to the back. There's an indication they could hear everything that was being said, even though the windows were rolled up in the squad car. There was even testimony from the defendant's mother that the windows were rolled up in the squad car, but she still could hear Norman Menagus (sic) hollering from the rear of the squad car, which she placed quite a distance from her home, which all goes to the credibility and the weight the Court had to give the testimony aduced [sic].

Based upon the totality of the evidence presented to the Court, in considering the credibility the Court has aduced [sic], based upon those witnesses [sic] testimony, the Court finds as follows:

The Court finds, first, in my first ruling that deals with the motion to quash, the Court finds that the arrest of the defendant was not a pretex [sic] or a subterfuge arrest. The Court finds that the defendant's arrest took place when he was placed in the squad car at 5191 South Hermitage immediately after the complainant Mrs. Anderson [sic] signed a complaint for disorderly conduct.

The Court further finds that there, the arrest was based upon probable cause and, therefore, the defendant, Daniel Anderson's [sic], motion to quash the arrest is denied.

Now, as to the motion to suppress statements, the Court finds that the defendant was in custodial arrest when he was placed in the police car in front of his home after Mrs. Anderson [sic] had signed the complaint for disorderly conduct. The Court further finds that the statements made in the squad car between the time of leaving the house and arriving at the police station at 35th and Lowe and also, the statements made in the parking lot of the police station at 35th and Lowe were not volunteered statements. And the Court finds that the defendant had not knowingly waived his right of Miranda rights at the time that those statements were given. Therefore, as to those statements only, the defendant's motion to suppress those statements is sustained.

Now, as to the subsequent statements given inside the police station, the Court finds that prior to such interrogation, the defendant was advised of his Miranda rights and that he knowingly and intelligently waived those particular rights. The Court further finds that the defendant was capable of appreciating and understanding the full meaning of his Miranda rights and waive them voluntarily, knowingly and intelligently.

The Court further finds that the statements were not obtained as a result of the interrogation, in contradiction of the defendant's request for food and water while manacled to the lock-up. The Court further finds that the statements were not obtained as a result of undue questions for a lengthy period of time for the promises of leniency being made to the defendant.

The Court further finds that the statements were not obtained as a result of physical coercion or psychological or mental coercion and were not obtained as a result of confronting the accused with evidence which had been obtained in derogation of his Constitutional rights. The Court also finds that the statements were not obtained as a result of material misrepresentations made to the Defendant. Therefore, as to the remaining statements,

the defendant's motion to suppress is denied.