THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MICHAEL MADDEN, Defendant-Appellant.

First District (3rd Division) Nos. 83—3068, 84—0148 cons.

Opinion filed October 15, 1986.

James J. Doherty, Public Defender, of Chicago (Robert P. Isaacson, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, James E. Fitzgerald, and Nancy L. Grauer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WHITE delivered the opinion of the court:

Following a stipulated bench trial, defendant Michael Madden was convicted of murder, rape and aggravated kidnaping. (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1, 11—1, 10—2(3).) He was sentenced to concurrent terms of natural-life imprisonment on the murder conviction, 30 years for the rape and 15 years for the aggravated kidnaping. On appeal, he contends that the trial court erroneously denied his motion to suppress his statement where the uncontradicted facts showed that: (1) he was interrogated shortly after his two suicide attempts; (2) the police violated specific physician's orders to bring him to a mental-health facility; (3) the interrogation period lasted 30 hours; (4) his I.Q. and problem-solving ability were very low; (5) a physician had injected him with Haldol, a major tranquilizer; and (6) the uncontradicted expert testimony was that he could not knowingly and voluntarily waive his constitutional rights.

At the suppression hearing, Officers Green and Dwyer testified that they arrested defendant at 8 a.m. on January 5, 1981. When Officer Green advised defendant of his rights, defendant stated that he understood and he appeared calm and able to understand questions. He was placed in an interview room and given a cup of coffee. No threats or promises were made to him.

Officer Reagan testified that he interviewed defendant, who appeared calm, at 8:30 a.m. on January 5, 1981. When the witness advised defendant of his rights, defendant said he understood and would be willing to talk, but denied participation in any crime. At approximately 1:30 p.m., Officer Reagan and Assistant State's Attorney Steingold entered the room. The assistant State's Attorney advised defendant of his rights and explained that he was not defendant's attorney. Defendant, who appeared calm and alert, stated that he understood. Officer Reagan and the assistant State's Attorney left the room after 15 minutes but reentered one-half hour later for 20 minutes at which time the assistant State's Attorney again advised defendant of his rights and defendant stated that he understood.

Officer Markham testified that after he advised defendant of his

rights at 5:30 p.m., defendant agreed to answer questions so the witness summoned the assistant State's Attorney, who again advised defendant of his rights. Defendant stated that he understood and the assistant State's Attorney left the room after approximately 30 minutes. During this conversation defendant asked the assistant State's Attorney what kind of deal he would get if he "talked," but the assistant State's Attorney stated that he could not make any offers. Defendant then made certain admissions regarding other cases.

When Officer Markham and Assistant State's Attorney Steingold reentered the room at approximately 7:30 p.m., defendant requested coffee, which was brought to him in a glass cup. He was then left alone in the room. At approximately 8 p.m. Officers Reagan, Markham and the assistant State's Attorney heard the sound of glass breaking. Upon reentering the interview room, Officer Reagan saw defendant cutting his wrist with a piece of glass. Reagan removed the glass and made arrangements to have defendant taken to a hospital. Officers Markham, Reagan and Assistant State's Attorney Steingold all testified that no threats or promises were made to defendant.

Officers Glynn and Redmond testified that when they brought defendant from the lockup for a lineup at 12:15 p.m. on January 6, 1981, he stated that he had eaten, but asked for some coffee which he was given. When they asked him about cutting his wrist the previous day, defendant stated that he was "just playing around." At approximately 2:30 p.m. the officers interviewed defendant after advising him of his rights. Defendant appeared calm, coherent, awake and alert. He seemed to understand the officers and stated that he understood his rights. He also did not appear to be under the influence of any drugs or alcohol. When defendant then made a statement, the officers summoned Assistant State's Attorney Joan Corboy, who explained to defendant that she was an assistant State's Attorney, not his attorney, and advised him of his rights. Defendant stated that he understood each of his rights. When she then asked him if he would tell her what he had just told the officers, defendant stated, "I have already admitted my guilt to them; do I have to talk to you?" When she replied "No," defendant requested a lawyer, and the assistant State's Attorney and the officers left the room. According to the assistant State's Attorney, defendant appeared articulate, alert and responsive, he did not appear to be under the influence of drugs or alcohol, and he made no complaints of mistreatment by the police. According to Officer Redmond no threats or promises were made to defendant in his presence.

Dr. Helen Morrison, a psychiatrist, testified as an expert witness for the defense. When she first examined defendant on January 29, 1981, he became very emotional and terminated the interview. She later reexamined him, interviewed his mother and sister, and examined reports from Provident Hospital, Cook County Hospital and Cermak Hospital, as well as prior police reports from 1980 and 1981, and treatment records from Michael Reese Hospital in October 1980 which listed defendant's symptoms as a gunshot wound, alcohol ingestion and nervousness. The Provident Hospital records from January 5, 1981, showed that defendant had been brought to the emergency room by police stating that he had cut his wrist. At the hospital a hidden piece of glass was found in his sock and he was given a five-milligram injection of Haldol, a major tranquilizer used for psychosis, because he was felt to be acutely suicidal. According to Dr. Morrison, one milligram of Haldol is equivalent to 100 milligrams of Thorazine and its potency if given by injection is extremely high. The half-life of Haldol is between 15 and 24 hours. Dr. Morrison expressed her opinion that as of January 6, 1981, at 2:30 p.m., when defendant made his statement, he could not have appreciated or understood what he was doing and would not have been able to exercise free will because of the combined effect of his mental state and long lasting effect of the Haldol.

Dr. Morrison further testified that defendant's I.Q. of 82 placed him at the dull-normal intellectual level close to the borderline-retardation range so that he would normally have difficulty with problem solving. Moreover, his X rays showed some organic dysfunction. Hence, defendant could be expected to have been more severely affected by Haldol, which would have increasingly impaired his ability to problem solve or understand. Dr. Morrison admitted that the Cook County Hospital records from January 6, 1981, at 1:27 a.m., showed that the physician did not consider defendant to be acutely psychotic, Dr. Garland's report stated that there was no gross organic pathology, a physician who reviewed defendant's brain scan stated that it was normal, and the report of defendant's electroencephalogram made no mention of abnormality. However, according to the witness, Dr. Garland's report showed certain indications of gross organic pathology and defendant's brain scan revealed possible epileptic forms. Moreover, the stress defendant was kept under for a prolonged period of time prior to his statement would affect his ability to problem solve. She further testified that Provident Hospital made a psychiatric reservation for defendant because of his suicidal behavior, but the police did not take him to that hospital but rather

took him to the police station. At 2:30 p.m. on January 6, 1981, defendant's speech would not necessarily be slurred and a lay person who did not know about the drug could be expected to characterize him as alert and oriented and not appearing as having outward signs of operating under the influence of Haldol. Dr. Morrison concluded that defendant would not have been able to exert his constitutional rights at 2:30 p.m. on January 6, 1981, because of his organic condition, the Haldol, and the extreme stress placed on him during the extended period of time he was held.

Dr. Helmut Jirku, a psychiatrist, testified that he saw defendant at the Cook County Hospital emergency room at approximately 2 a.m. on January 6, 1981. Dr. Jirku was told that defendant had attempted to slash his wrist, had exhibited unusual behavior, and had been crying or singing earlier while at Provident Hospital. However, at Cook County Hospital defendant was acting calmly, not psychotically, and was oriented. Dr. Jirku, who did not have a complete medical history or the Provident Hospital records, determined that defendant was not acutely psychotic. However, Dr. Jirku further testified that if he had known that defendant had previously been given Haldol, he would have diagnosed an acute psychotic episode. Defendant was not given psychiatric treatment at Cook County Hospital because it has no psychiatric facility. However, in Dr. Jirku's opinion, defendant needed psychiatric treatment because of his suicidal behavior. If Dr. Jirku had known that defendant required Haldol, he would have been more insistent upon recommending to the officers that defendant be sent to a psychiatric facility. The witness noted on the hospital record that defendant had been seen at Cermak Hospital.

Dr. Tungi Ladipo testified that he was working at the Provident Hospital emergency room on January 5, 1981. He sutured defendant's wrist and prescribed a five-milligram injection of Haldol because defendant became agitated, broke a bottle, tried to drink the contents, and tried to cut himself with the glass while at the hospital. The witness prescribed Haldol to calm defendant and also because defendant may have had some psychotic episode that the witness wanted to bring under control. Dr. Ladipo then arranged to have defendant admitted to Cermak Hospital because he needed further hospitalization. The police refused to allow defendant to be transferred by ambulance but said they would take defendant there.

In rebuttal, the State presented Dr. Wettstein, a psychiatrist, who testified that five milligrams of Haldol is a relatively small dose because doses of 50 to 100 milligrams are prescribed for patients with major psychiatric problems. Although people react differently to

the same medication, in general, a five-milligram dose of Haldol would have a minimal effect upon someone, which might include mild drowsiness or sedation, difficulty with movement or slurred speech. According to Dr. Wettstein, half of the drug would be metabolized within 15 to 24 hours, so that 17 hours after the injection of five milligrams of Haldol, only approximately 2½ milligrams would be left in the body. A dose of 2½ milligrams of Haldol would not present anything more than a mild, if at all, noticeable degree of sedation, drowsiness, confusion or movement disorder. He admitted that after 17 hours the drug might have an effect that only the patient would notice. However, at 2:30 p.m. on January 6, 1981, if the drug had any effect at all, it would make a psychotic person less psychotic and might reduce hallucinations, delusions, anxiety, agitation, or any kind of impairment of attention or concentration span.

Dr. Wettstein further testified that if someone of defendant's height and weight were not psychotic the effect of a five-milligram injection of Haldol might be different. He acknowledged a recent study which reported prolonged adverse effects of Haldol when given orally to normal subjects. The witness reviewed defendant's police report, reports of Drs. Morrison and Silverstein and hospital records from Provident Hospital, Cook County Hospital and Cermak Hospital, and reports from the Psychiatric Institute. These records showed that defendant's I.Q. was 82, his EEG showed no abnormality and Dr. Silverstein found that he had difficulty with problem solving. In expressing his opinion regarding the hypothetical effect of Haldol, Dr. Wettstein did not base his opinion on defendant's medical record. However, the factors that Dr. Wettstein disregarded in reaching his hypothetical opinion would have no effect as to the half-life of Haldol. Moreover, nothing in Dr. Jirku's report or any other report explicitly indicated that defendant was experiencing any recognized side effects of Haldol.

Officer Redmond further testified in rebuttal that when he interviewed defendant on January 6, 1981, defendant's speech was clear, his walking appeared normal, and he had no complaints of panic attacks, inability to concentrate, desire to keep moving, blurred vision, or dry mouth.

The trial court then denied defendant's motion to suppress. The trial court specifically found that defendant was not coerced into making a statement and that based upon the totality of the expert testimony and testimony of the lay witnesses, and the period of time that elapsed since the injection of Haldol, that defendant understandingly, voluntarily, knowingly and intelligently waived his *Miranda*

rights subsequent to the Haldol injection.

On appeal defendant contends that the trial court erroneously denied his motion to suppress his statement. We do not agree.

■■■ The fundamental principle governing the admission of an accused's statement is well known: the statement must be voluntary, otherwise it is totally inadmissible. (*People v. Berry* (1984), 123 Ill. App. 3d 1042, 1044, 463 N.E.2d 1044.) The test of whether a statement is admissible at trial is whether it has been made freely, voluntarily and without compulsion or inducement of any sort; the accused's will must not have been overcome at the time he confessed. (*People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731.) This determination depends upon the totality of the relevant circumstances surrounding the making of the statement including the existence of any threats, promises or physical coercion, the length and intensity of the interrogation and the accused's age, intelligence, experience and physical condition. (*People v. Rhodes* (1983), 119 Ill. App. 3d 1002, 1008-09, 457 N.E.2d 1300.) The State bears the burden of showing that the statement was knowingly and voluntarily made. (*People v. Berry* (1984), 123 Ill. App. 3d 1042, 1044, 463 N.E.2d 1044.) In making its determination as to the voluntary nature of the statement, the court is not required to be convinced beyond a reasonable doubt, and the finding of the trial court on this question will not be disturbed unless it is contrary to the manifest weight of the evidence. *People v. Rhodes* (1983), 119 Ill. App. 3d 1002, 1009, 457 N.E.2d 1300.

■■ Defendant first contends that the statement should have been suppressed where the uncontradicted facts indicated that he was interrogated shortly after his two suicide attempts. However, defendant cites no authority in support of this proposition. Moreover, in *People v. Pawlicke* (1978), 62 Ill. App. 3d 791, 796-97, 379 N.E.2d 798, the court found that the fact that defendant felt depressed and was contemplating suicide, that she may have consumed two bottles of wine and taken four Librium tablets on the morning of the murder, that her intelligence was "dull," and that her attention was focused on the deceased and her emotional relationship with him did not require a conclusion that her subsequent statements were involuntary.

■■ Defendant further contends that his statement should have been suppressed where the uncontradicted facts showed that police violated specific physician's orders to bring him to a mental-health facility. However, there is evidence in the record to the contrary. Al-

though Dr. Morrison testified that police did not take defendant to a psychiatric facility as recommended by the physician at Provident Hospital, there is evidence in the record that the police did in fact take defendant to Cermak Hospital as recommended by Dr. Ladipo. Dr. Morrison and Dr. Wettstein both testified that they had examined the reports from Cermak Hospital. Dr. Jirku, who saw defendant at Cook County Hospital at 2 a.m. on January 6, 1981, also testified that he noted on the hospital record that defendant had been seen at Cermak Hospital. This evidence gives rise to a reasonable inference that after leaving Provident Hospital at approximately 10 p.m. on January 5, 1981, the police brought defendant to Cermak Hospital sometime before his arrival at Cook County Hospital at approximately 2 a.m. on January 6, 1981. Moreover, although Dr. Jirku testified at trial that if he had known of the Haldol injection he would have been more insistent in recommending specifically to the officer that the patient be sent to a psychiatric facility, he did not testify that he made an explicit order that defendant be admitted to a psychiatric facility.

Defendant cites *People v. Rhoads* (1979), 73 Ill. App. 3d 288, 391 N.E.2d 512, in support of his argument. However, there the police offered defendant treatment in exchange for a statement. In this case there is no evidence that the officers induced a statement by either offering psychiatric treatment or threatening to withhold such treatment if defendant did not make a statement.

■ Defendant next contends that his statement should be suppressed where the interrogation period lasted 30 hours. However, the evidence in this case affirmatively shows that defendant's questioning was limited to short, reasonable lengths of time on separate days. (See *People v. Williams* (1948), 128 Ill. App. 3d 384, 392, 470 N.E.2d 1140.) Defendant's questioning was limited to short periods of time between 8:30 a.m. and 7:30 p.m. on January 5, 1981, the date of his arrest. Moreover, there is no evidence that defendant was questioned at all between the hours of 7:30 p.m. on January 5, 1981, and 2:30 p.m. on January 6, 1981, at the time he made his statement. Moreover, the record shows that defendant was given food and coffee, he appeared calm and coherent, and he affirmatively told the officers that he understood his rights.

■ Defendant further contends that his confession should be suppressed because his I.Q. and his problem-solving ability were very low. However, mental deficiency alone is not enough to render a confession or statement involuntary, but rather is one issue to be considered in the totality of circumstances under which the statement was

made. *People v. Turner* (1973), 56 Ill. 2d 201, 206, 306 N.E.2d 27; *People v. Racanelli* (1985), 132 Ill. App. 3d 124, 132, 476 N.E.2d 1179; *People v. Williams* (1984), 128 Ill. App. 3d 384, 391, 470 N.E.2d 1140.

In *People v. Racanelli* (1985), 132 Ill. App. 3d 124, 476 N.E.2d 1179, despite a psychologist's testimony that the defendant had an I.Q. of 54 and probably could not understand the *Miranda* warnings unless they were explained to him, this court found that the trial court could properly find his statement was voluntary as supported by evidence that he appeared to understand the warnings, he affirmatively told police that he understood the warnings, and he had some prior experience with the criminal court system. Similarly, in *People v. Clements* (1985), 135 Ill. App. 3d 1001, 482 N.E.2d 675, despite a psychologist's testimony that the defendant there had an I.Q. of 58, this court concluded that the trial court could properly find that his statement was voluntary where the record disclosed that each police officer and the assistant State's Attorney advised the defendant of his rights prior to each interview, further testified that they did not observe any unusual physical or personality traits, and that the defendant responded intelligently to the questions asked.

■ In this case, defendant had an I.Q. of 82. He had some prior experience with the criminal court system by way of a prior armed-robbery conviction, and his familiarity with the system was further demonstrated by the fact that he questioned the assistant State's Attorney about making a deal. Moreover, each police officer and the assistant State's Attorney testified that, after they advised defendant of his rights prior to each interview, defendant affirmatively stated that he understood his rights and appeared to have no trouble understanding them. In addition, the evidence affirmatively shows that, immediately after making his statement to police officers, defendant exercised his *Miranda* rights upon questioning by the assistant State's Attorney.

■ ■ Defendant next contends that his confession should be suppressed because the physician had injected him with Haldol. We do not agree.

The fact that a defendant is under the influence of drugs or alcohol when he confesses does not automatically render that confession inadmissible. (*People v. Andersen* (1985), 134 Ill. App. 3d 80, 95, 479 N.E.2d 1164.) A statement made by a defendant taking medication will be considered involuntary only if the subsequent statement "is, *in fact,* induced by the administration of a drug." (Emphasis in original.) (*People v. Kincaid* (1981), 87 Ill. 2d 107, 117, 429 N.E.2d 508;

*People v. Phillips* (1982), 110 Ill. App. 3d 1092, 1103, 443 N.E.2d 655.) Suppression is warranted when the evidence clearly demonstrates that, because of his condition, defendant lacks the capacity to waive his rights, but when the proof is less clear the evidence of the defendant's drugged or intoxicated condition merely goes to the weight to be given to the defendant's confession without barring it altogether. (*People v. Andersen* (1985), 134 Ill. App. 3d 80, 95, 479 N.E.2d 1164.) Whether a confession obtained after a drug has been administered to an accused is voluntary is a question for the trial court to decide, and where, as here, the trial court finds that a confession is voluntary, our inquiry on review is limited to whether that finding is contrary to the manifest weight of the evidence. *People v. Kincaid* (1981), 87 Ill. 2d 107, 117-18, 429 N.E.2d 508.

In *People v. Kincaid* (1981), 87 Ill. 2d 107, 429 N.E.2d 508, the defendant made a statement less than two hours after receiving a five-milligram injection of Haldol following an unsuccessful suicide attempt while in custody. The supreme court held that the trial court could properly find that the confession was voluntary, noting the physician's testimony that, while Haldol may cause many side effects, the drug may also act to cause an unruly person to calm down and act rationally. The court reached this conclusion despite the defendant's testimony in that case that after receiving this injection he felt "high" and sleepy.

In this case, there was no evidence that defendant suffered any ill effects of the drug and each police officer and assistant State's Attorney testified that defendant did not appear to be under the influence of drugs or alcohol. Rather, these witnesses testified that defendant appeared to be calm, coherent, alert and appeared to understand them. Dr. Wettstein also testified that at the time of defendant's statement, he would have had only 2½ milligrams of the drug remaining in his system which, if it had any effect at all, would have made a psychotic person less psychotic and might reduce any anxiety, agitation, or any impairment of attention or concentration span. Moreover, as in *People v. Kincaid* (1981), 87 Ill. 2d 107, 429 N.E.2d 508, defendant's behavior in making his statement was inconsistent with that of someone whose will has been overborne because his statement was calculated to limit its incriminating effect.

Defendant finally contends that his statement should have been suppressed because the uncontradicted expert testimony was that he could not knowingly and voluntarily waive his constitutional rights. However, a trial court is not obligated to adopt an expert witness' conclusion because the trial court, not the expert, is the

trier of fact. (See *People v. Columbo* (1983), 118 Ill. App. 3d 882, 455 N.E.2d 733.) The trier of fact may properly accept lay testimony over expert testimony (see *People v. Marshall* (1983), 114 Ill. App. 3d 217, 226, 448 N.E.2d 969), and the weight to be given an expert's opinion is measured by the reasons given for the conclusion and the factual details which he marshals in support of it (*People v. Teague* (1982), 108 Ill. App. 3d 891, 899, 439 N.E.2d 1066). Resolution of contradictory testimony and determination of its weight and credibility are for the trier of fact. *People v. Teague* (1982), 108 Ill. App. 3d 891, 899, 439 N.E.2d 1066.

 Initially, we note that the cases cited by defendant are inapposite because the uncontradicted evidence in those cases was factual testimony concerning events which transpired during questioning rather than the opinions of an expert witness. Moreover, it is not clear that Dr. Morrison's opinion was uncontradicted on the effect of the Haldol injection where Dr. Wettstein testified that at the time defendant confessed, if the drug had any effect at all, it would make a psychotic person less psychotic, and might reduce his anxiety, agitation and any kind of impairment of attention or concentration span. We further note that Dr. Jirku, who saw defendant following the injection, did not report any recognized side effects of Haldol, but rather reported that he was acting calmly, not psychotically, and was oriented. In addition, the officers who obtained defendant's statement both testified that he appeared calm, coherent, and awake, he seemed to understand them, stated that he understood his rights and did not appear to be under the influence of any drugs. Under the circumstances, we conclude that the trial court could properly reject Dr. Morrison's conclusion and determine that defendant knowingly and voluntarily waived his constitutional rights.

Accordingly, we affirm the judgment of the circuit court of Cook County.

Judgment affirmed.

McNAMARA and McGILLICUDDY, JJ., concur.