916 F.2d 715
 Unpublished Disposition
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Michael MADDEN, Petitioner-Appellant,
v.
Michael O'LEARY, Warden and Neil F. Hartigan, Respondents-Appellees.
 No. 89-3431.
 United States Court of Appeals, Seventh Circuit.
 Submitted Oct. 9, 1990.*
Decided Oct. 18, 1990.
 
 Before COFFEY, FLAUM and EASTERBROOK, Circuit Judges.
 
 ORDER
 
 1
 Michael Madden appeals pro se from the district court's denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. Sec. 2254. Madden challenges his conviction and sentence on essentially three grounds. Upon review of the record, we conclude that the district court properly identified and resolved the issues presented on appeal. We reach this conclusion under either a de novo or a deferential standard of review. See Smith v. Duckworth, 910 F.2d 1492 (7th Cir.1990); see also United States v. Rutledge, 900 F.2d 1127, 1128-29 (7th Cir.) (questioning de novo standard of appellate review of voluntariness of confessions), petition for cert. filed, 59 U.S.L.W. ---- (U.S. Aug. 23, 1990) (No. 90-5435); cf. United States v. Wildes, 910 F.2d 1484 (7th Cir.1990) (applying deferential standard of review to voluntariness of guilty pleas). We therefore affirm the judgment below for the reasons stated in the attached memorandum opinion and order.
 
 
 2
 We discern no abuse of discretion in the district court's refusal to appoint counsel, see McNeil v. Lowney, 831 F.2d 1368, 1371 (7th Cir.1987), cert. denied, 485 U.S. 965 (1988), and refuse to do so here. Madden fairly presented his arguments both before the district court and on appeal. He failed to demonstrate any inability to research the issues that he raised or to show how counsel could have presented his case more effectively. His motion for appointment of counsel accordingly is denied.
 
 ATTACHMENT
 
 3
 IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN
 
 DISTRICT OF ILLINOIS EASTERN DIVISION
 
 4
 UNITED STATES OF AMERICA ex rel. MICHAEL MADDEN, Petitioner,
 
 
 5
 v.
 
 
 6
 MICHAEL O'LEARY, Respondent.
 
 
 7
 Sept. 26, 1989.
 
 No. 87 C 7796
 MEMORANDUM OPINION AND ORDER
 
 8
 NORDBERG, District Judge.
 
 I. INTRODUCTION
 
 9
 The petitioner, Michael Madden, confessed to the murder and rape of Alfreda Creekmore, and after the Illinois state trial court denied his motion to suppress his confession, he proceeded to a bench trial on stipulated facts. On December 16, 1983, he was convicted of murder, rape, and aggravated kidnapping and was sentenced to concurrent terms of natural life imprisonment for the murder, thirty years for the rape, and fifteen years for the aggravated kidnapping. He appealed his conviction to the Illinois Appellate Court, arguing that his confession was involuntary. The appellate court held that the confession was voluntary, even though given seventeen hours after he had received an intramuscular injection of Haldol, a tranquilizer used to treat psychosis. People v. Madden, 148 Ill.App.3d 988, 501 N.E.2d 1297 (1986). The Illinois Supreme Court subsequently denied his petition for leave to appeal, and the petitioner then filed a motion for post-conviction relied, which he later withdrew.[1] Mr. Madden then filed this petition for a writ of habeas corpus, again alleging that his confession was involuntary. For the following reasons, the court denies the petition.[2]
 
 II. STANDARD OF REVIEW
 
 10
 In this case the state trial and appellate courts made specific findings that the petitioner was adequately informed of his Miranda rights; that he knowingly, intelligently, and voluntarily waived his right against self-incrimination; and that his subsequent confession was not the product of a will overborne by the effects of the Haldol injection or improper police conduct. The issue here is what degree of deference this court should accord to these state findings of fact under 28 U.S.C. Sec. 2254(d) (1982).
 
 
 11
 The ultimate issue whether a confession was voluntary implicates a uniquely federal concern and is a question of law subject to de novo federal review. Miller v. Fenton, 474 U.S. 104, 115-18 (1985); see, e.g., Ray v. Duckworth, No. 87-2774, slip op. at 9-10 (7th Cir. Aug. 9, 1989); Weidner v. Thieret, 866 F.2d 958, 961 (7th Cir.1989); Smith v. Duckworth, 856 F.2d 909, 912 (7th Cir.1988); Sotelo v. Indiana State Prison, 850 F.2d 1244, 1247 (7th Cir.1988); Bryan v. Warden, Ind. State Reformatory, 820 F.2d 217, 219 (7th Cir.), cert. denied, 108 S.Ct. 190 (1987); Perri v. Director, Dep't of Corrections, 817 F.2d 448, 450 (7th Cir.), cert. denied, 108 S.Ct. 135 (1987); cf. United States v. Hawkins, 823 F.2d 1020, 1022-23 & n. 1 (7th Cir.1987) (standard is the same on direct federal review). But cf. Sotelo, 850 F.2d at 1253-55 (Easterbrook, J., concurring) (concluding after extensive discussion of difference between factual questions, legal questions, and "mixed" questions of fact and law that Miller does not require independent federal appellate review of voluntariness of confession). Nevertheless, "subsidiary questions, such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the Miranda warnings, often require the resolution of conflicting testimony of police and defendant," and, therefore, are factual questions entitled to a presumption of correctness under section 2254(d), if fairly supported by the record. Miller, 474 U.S. at 117. The federal district court's inquiry has been described as follows: "The state court finds the underlying facts, of the 'who did what to whom, when, where, and why' variety, and the federal district court defers to these findings under section 2254(d); but then the federal court makes its own judgment whether the findings 'add up' to coercion." Weidner, 866 F.2d at 961.
 
 
 12
 By contrast, a state court's determination that a suspect's waiver of his Miranda rights was knowing and intelligent, see Perri, 817 F.2d at 450-53, or that it was voluntary, see Bryan, 820 F.2d at 219-20, does not require the application of legal principles to historical facts and, therefore, is a factual question entitled to deference under section 2254(d); in other words, the "final conclusion of whether a waiver was [knowing, intelligent, and voluntary] is disposed of by a state court's ascertainment of subsidiary factual determinations." Perri, 817 F.2d at 451; see also Bryan, 820 F.2d at 220 ("The [inquiry whether a confession was voluntary] requires a determination of whether the process was fundamentally fair--a uniquely federal concern, ...--while the [inquiry whether a waiver was voluntary] concerns only a factual inquiry.") (citation omitted). Furthermore, even if the state court does not make an explicit determination of the validity of the waiver, a federal court may rely on findings implicit in the state court's ruling; for example, the state court's admission of a confession may be viewed as an implicit finding that the defendant voluntarily waived his Miranda rights. See, e.g., Smith, 856 F.2d at 912. Thus, in making the following findings of fact, the court has conducted an independent review of the entire state court record--including the trial record, the briefs on appeal, and the appellate court opinion--and has given appropriate deference to the trial and appellate courts' subsidiary findings of fact and to their conclusions that the petitioner knowingly, intelligently, and voluntarily waived his Miranda rights.
 
 III. FACTS
 
 13
 On December 28, 1980, Alfreda Creekmore was raped, beaten, and murdered in an elevator of a public housing project in Chicago. After a janitor discovered Ms. Creekmore's body, the police were summoned, and technicians found what turned out to be the petitioner's fingerprints on the elevator handrail. Record at 550-59. Subsequently, another building resident, Ms. Lavela Golden, made a photographic identification of the petitioner as the man who had beaten, robbed, and attempted to rape her in the same elevator on September 27, 1980. Id. at 564-66. Furthermore, another building resident, Mr. Randolph Featherstone, also identified the petitioner as being with him in an elevator in the building during the early morning hours of December 28. Id. at 567-69.
 
 
 14
 On January 5, 1981, at approximately 8:00 a.m., Chicago police officers Green, Dwyer, and Perry arrested the petitioner on a warrant for the robbery of Ms. Golden. The petitioner was handcuffed, placed in a squad car, and taken to Area One police headquarters. After Officer Green advised the petitioner of his Miranda rights, the petitioner responded: "[T]his is b___s___." Id. at 21. The officers did not question him at that time. Id. at 20-21.
 
 
 15
 After their arrival at police headquarters, the officers uncuffed the petitioner and asked him routine booking questions. The petitioner was very calm, cooperative, and able to understand the officers' questions. Id. at 22-23, 65. Between 8:30 and 9:00 a.m., the petitioner was given a cup of coffee and placed in an interview room, still uncuffed and still calm. Id. at 81. He was not questioned.
 
 
 16
 Shortly thereafter, Detective Reagan moved the petitioner to another, nearby interview room. Id. at 24-25, 82. Detective Reagan advised him of his Miranda rights, and the petitioner indicated that he understood those rights and was willing to speak to the officer. Id. at 82-85. The petitioner stated that he knew the reason for his arrest, but also denied participation in any crime. When he was told that a lineup would be conducted and that his attorney could be present, the petitioner told Detective Reagan that "he did not need an attorney[;] he just wanted to get it done with." Id. at 85. At this point the interview stopped because Detective Reagan had to contact victims for the lineup. This first interview lasted approximately ten minutes, during which time the petitioner remained calm. Id. at 75, 86, 100-01.
 
 
 17
 At approximately 11:15 a.m. Officers Green and Dwyer took the petitioner to a lockup facility, id. at 26, 45, 68, and he was placed in a lineup at about 1:00 p.m., id. at 87. He chose his position in the lineup and was able fully to follow the officers' instructions. Id. at 26-28, 70.
 
 
 18
 After the lineup the petitioner was returned to the interview room, and at approximately 2:00 p.m. Detective Reagan and Assistant State's Attorney Steingold entered the room. Steingold identified himself, explained that he was not the petitioner's attorney, and then advised him of his Miranda rights. The petitioner, who appeared calm and alert, indicated again that he understood his rights. Id. at 247-49. They questioned him approximately ten to fifteen minutes[3] and then left the room. Id. at 250.
 
 
 19
 The two men reentered the room at about 3:30 to 4:00 p.m. and readvised the petitioner of his rights, who again stated that he understood and agreed to speak with them. The conversation lasted approximately ten to fifteen minutes, id. at 91, 251, during which time the petitioner remained calm and alert, id. at 253.
 
 
 20
 At approximately 5:00 p.m., the petitioner participated in another lineup and then was returned to the interview room, uncuffed. Id. at 91. At approximately 5:30 p.m., Detective Markham and Assistant State's Attorney Steingold advised him of his rights, and after the petitioner indicated that he understood his rights and was willing to talk with them, Detective Markham questioned him for about ten to fifteen minutes, id. at 124-25, and the petitioner calmly answered the questions. He did not request to make a phone call or to see an attorney.
 
 
 21
 At about 7:00 p.m., the two men reentered the room, advised the petitioner of his rights, and interviewed him about an unrelated homicide. Detective Markham left the room for a few minutes, and Steingold continued to speak with the petitioner. During this part of the interview, the petitioner asked Steingold "what kind of deal he would get if he would talk." Id. at 256. Steingold responded that he did not know all the relevant evidence and therefore could not make any promises or offers. The petitioner also asked what his maximum sentence would be if he went to trial, but Steingold again told him that he did not know. Id. at 257. The petitioner then made certain admissions about other cases. Id. at 260.
 
 
 22
 The petitioner then asked for some coffee, which was brought to him in a glass cup, id. at 92, 128, and the two men then left, leaving him alone in the room. Throughout the interviews conducted on January 5, neither the officers nor the assistant state's attorney made any promises or threats to the petitioner, who consistently was calm and did not appear to be under the influence of drugs or alcohol. Furthermore, although the petitioner was given repeated Miranda warnings, he never requested counsel or sought permission to use the telephone and never terminated the brief interviews, always agreeing to talk with the officers. Id. at 23-30, 71, 97-98, 131-32.
 
 
 23
 At approximately 8:00 p.m., Officers Reagan and Markham and Assistant State's Attorney Steingold heard the sound of breaking glass from the interview room. Id. at 95, 129. The first to enter the room, Officer Reagan saw the petitioner attempting to cut his wrist with a piece of glass. Id. at 92-96. The officer removed the glass from the room, gave the petitioner a towel for his wrist (which was not bleeding badly, id. at 130, 263), and made arrangements to have him transported by squadroll personnel to Provident Hospital. Id. at 110, 112-13, 117.
 
 
 24
 The petitioner arrived at the Provident Hospital emergency room at approximately 8:20 p.m. and was kicking, screaming, and refusing treatment. Supplemental Record at 3-4. Dr. Tungi Ladipo, an emergency room physician, eventually sutured what he described as a "superficial, not deep" cut to the petitioner's wrist. Id. at 6-7, 17. The petitioner told Dr. Ladipo that he had attempted suicide several years earlier, id. at 13, and then became agitated, broke a bottle and tried to drink its contents, and attempted to cut himself with the broken glass. After this second purported suicide attempt, Dr. Ladipo prescribed a five-milligram injection of Haldol to calm him down and to control what appeared to be a psychotic episode. The injection was administered at 9:38 p.m.
 
 
 25
 Dr. Ladipo then arranged to have the petitioner transported by ambulance to Cermak Hospital for further psychiatric treatment. The police officers refused to transport him by ambulance because he was under arrest and in their custody, id. at 10-11, but at approximately 10:00 p.m. they took him to Cermak Hospital, as recommended.[4]
 
 
 26
 At approximately 2:00 a.m. on January 6, the petitioner was transported from Cermak Hospital to Cook County Hospital, where Dr. Helmut Jirku, an emergency room psychiatrist, treated him. Record at 373-74, 381. Although Dr. Jirku was told that the petitioner had been crying and singing at Provident and there had purportedly attempted suicide again, he was not told that he had been given an injection of Haldol. The petitioner was calm and appeared in reasonably good mental health. Dr. Jirku did not find the petitioner to be acutely psychotic and, in fact, diagnosed him as a sociopath. Id. at 376-78, 385. After about fifteen to thirty minutes of observation and treatment, Dr. Jirku allowed him to be released to the custody of the officers,[5] who returned him to the interview room but did not question him.
 
 
 27
 At about 12:15 p.m. on January 6, Officers Glynn and Redmond brought the petitioner in yet another lineup. After returning him to the interview room, they asked him about his cut to his wrist, and the petitioner replied that he just been "playing." Id. at 166, 207. When they also asked him whether he wanted any food, the petitioner responded that he already had eaten a sandwich, but would accept a cup of coffee (which the officers brought him--this time in a paper cup). Id. at 165-66, 207-08. They did not question the petitioner further, but instead left the room. Id. at 167-68, 208, 210.
 
 
 28
 At about 2:30 p.m., Officers Glynn and Redmond returned to the room and again advised him of his Miranda rights. The petitioner, who appeared calm, coherent, alert, and not under the influence of drugs or alcohol, again affirmed that he understood his rights and wished to speak to the officers. Id. at 171, 173, 210-12. At this point he made the now-challenged confession to the murder of Alfreda Creekmore. Id. at 175, 213-15.[6]
 
 
 29
 After the petitioner made his statement, the officers summoned Assistant State's Attorney Corboy, who explained to the petitioner that she was a prosecutor, not his attorney, and advised him of his rights. Id. at 176-78, 216, 233-35. When she asked the petitioner whether he wished to speak with her, he replied: " 'I have already admitted my guilt to them; do I have to talk to you?' " Id. at 236. Corboy told him that he did not have to talk with her. He then requested counsel, and Corboy and the officers questioned him no further and promptly left the room. Id. at 179, 217, 237.
 
 
 30
 Throughout the interviews on January 5 and 6, the petitioner appeared calm, alert, articulate, and responsive. The officers did not make any threats or promises to him, and they provided him with food, drink, and adequate time for sleep. Indeed, the petitioner himself never complained of any police mistreatment, but instead responded positively to the officers' attempts to interview him, terminating only the attempt by Corboy.
 
 
 31
 At the suppression hearing the dispute quickly focused on the effect on the petitioner of the Haldol injection. Dr. Helen Morrison, a psychiatrist, testified as a defense expert and described her first examination of the petitioner, conducted on January 29--some twenty-three days after his confession. During that interview, however, he became very emotional and terminated the interview. She later reexamined him sometime in March, interviewed his mother and sister, and examined reports from Provident, Cermak, and Cook County Hospitals. She testified that one milligram of Haldol was equivalent to 100 milligrams of Thorazine and was especially potent when administered by injection; and since Haldol had a half-life between fifteen and twenty-four hours, approximately two and one-half grams would have remained in the petitioner's system by the time of his confession at 2:30 p.m. on January 6--seventeen hours after the injection.
 
 
 32
 Dr. Morrison also testified that the petitioner's IQ of 82 placed him at the dull-normal intellectual level close to the borderline-retardation range, such that he would have had difficulty with problem solving. Moreover, according to Dr. Morrison X-rays indicated some organic dysfunction, possibly epileptic discharges, which would have rendered the petitioner more susceptible to the effects of Haldol. She acknowledged, however, that records from Cook County indicated that he was ambulatory, coherent, and certainly not acutely psychotic. Moreover, she also conceded that the effect of Haldol varies with the individual patient, id. at 300, 302, and that because she had not performed a physical examination on the petitioner she could not have known what effect--if any--the Haldol would have had at the time of his confession. Id. at 302-03, 356. Nevertheless, she concluded that the injection of Haldol, coupled with the petitioner's alleged organic abnormalities and the stress resulting from prolonged detention, rendered him incapable of voluntarily exercising his constitutional right against self-incrimination. Id. at 297, 299, 348-49, 357.
 
 
 33
 Dr. Wettstein, a psychiatrist testifying for the State in rebuttal, disputed in part Dr. Morrison's finding of organic dysfunction, noting that the petitioner's electroencephalogram showed no abnormalities. Furthermore, Dr. Wettstein testified that five milligrams of Haldol is a relatively small dose, since doses of fifty to one hundred milligrams are prescribed routinely for persons with major psychiatric problems. A five-milligram dose of Haldol, according to Dr. Wettstein, would have a minimal effect on a person, and these side-effects could include mild drowsiness and sedation, difficulty with movement, and slurred speech. Id. at 402-03. Nevertheless, after seventeen hours there would have been only two and one-half milligrams of Haldol left in the petitioner's system; this small amount, if it had any effect at all, actually would have made a psychotic person less psychotic, reducing hallucinations, delusions, anxiety, agitation, or any kind of impairment to attention or concentration span. Id. at 409. Although he testified that if someone of the petitioner's height and weight were not psychotic the effect of Haldol may have been different, none of these side effects were reported by trained personnel at any of the hospitals or by the police officers at the station. Id. at 417, 462-63.
 
 
 34
 The trial court denied the petitioner's motion to suppress.[7] The trial court specifically found that the petitioner was properly advised of his Miranda rights prior to every interrogation and that he knowingly and voluntarily waived those rights prior to making his statements. The court also found that neither the various police officers nor the two assistant state's attorneys made any threat or promises to the petitioner; nor did they improperly "trick or cajol [sic] or induce" the petitioner into making his confession. Id. at 530. Finally, the court found that, given the period of time that had elapsed since the Haldol injection, the petitioner's ability knowingly, intelligently, and voluntarily to waive his constitutional rights was not impaired. Id. at 529-31.
 
 
 35
 The appellate court agreed, likewise finding that neither the officers nor the assistant state's attorneys made any threats or promises to extract the confession; that every interview session was preceded by appropriate Miranda warnings and limited to short, reasonable lengths of time; that the petitioner was not questioned at all between 7:30 p.m. on January 5 and 2:30 p.m. on January 6; that the petitioner was provided with food and coffee and was not deprived of sleep; that the petitioner was not suffering from any adverse side effects of Haldol at the time of his confession, appearing calm and coherent throughout the two-day period with the exception of the first purported suicide attempt; that although his IQ was 82, he had had prior experience with the criminal justice system (a conviction for armed robbery), and that this familiarity with the system was evidenced by his request to "make a deal" with Assistant State's Attorney Steingold; that his confession, calculated to limit its incriminating effect, showed that his will was not overborne, as did his refusal to talk to Assistant State's Attorney Corboy and his request for an attorney; and, finally, that the waiver of his rights, and his subsequent confession, were given knowingly, intelligently, and voluntarily. 148 Ill.App.3d at 996-1000, 501 N.E.2d at 1302-05. In his petition for a writ of habeas corpus, Mr. Madden now challenges the state courts' findings that his confession was voluntary.
 
 IV. ANALYSIS
 
 36
 In this case both state courts made explicit findings that the petitioner knowingly, intelligently, and voluntarily waived his Miranda rights, and these findings are more than adequately supported by the record, especially given the petitioner's age (21); his prior experience with the criminal justice system and his awareness of his rights (as evidenced, for example, by his wish to "make a deal" with Assistant State's Attorney Steingold); and the consistent testimony of all the police officers and assistant state's attorneys that the petitioner was given Miranda warnings before every interrogation.[8] The next question, then, is whether, based on the "totality of the circumstances," the petitioner's confession was involuntary and violative of the due process clause. Perri, 817 F.2d at 452. These factors include
 
 
 37
 the youth of the accused, ...; his lack of education, ...; or his low intelligence, ...; the lack of any advice to the accused of his constitutional rights, ...; the length of detention, ...; the repeated and prolonged nature of the questioning, ...; and the use of physical punishment such as the deprivation of food or sleep.
 
 
 38
 Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973) (citations omitted); see, e.g., Weidner, 866 F.2d at 963; Smith, 856 F.2d at 912.
 
 
 39
 Nevertheless, the voluntariness inquiry hinges upon a threshold finding of coercive or overreaching police activity. Although the suspect's mental condition is "relevant" to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry," since the due process clause requires some kind of "state action." Colorado v. Connelly, 479 U.S. 152, 165 (1986); id. at 167 ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."); see, e.g., Smith, 856 F.2d at 913. Moreover, there must be a causal connection, an "essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other." Connelly, 479 U.S. at 165. "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." Id. at 164; see also id. at 169-70 (courts cannot import notions of "free will" into Miranda waiver inquiry).
 
 
 40
 As the state courts noted, there is absolutely no evidence in the record of improper police conduct resulting in a coerced confession. Every interrogation was preceded by the petitioner's being properly informed of, and knowingly and voluntarily waiving, his Miranda rights. Furthermore, the fact that the petitioner was detained for thirty hours is not dispositive, since the actual questioning was limited to short, reasonable periods of time, and the petitioner was provided with food and drink and was not deprived of sleep. See Hawkins, 823 F.2d at 1023 (mere fact suspect detained overnight does not, by itself, give rise to conclusion that confession was involuntary). In fact, during the entire two-day detention period the petitioner was interviewed for a total of approximately three hours, and he was not questioned at all from 7:30 p.m. on January 5 until 2:30 p.m. on January 6. During this time he never requested to see an attorney (though he was given an opportunity to consult with counsel), and there is no evidence that the police threatened, tricked, or otherwise induced him to confess; moreover, once the petitioner requested an attorney, all interrogation ceased immediately. Thus, since there is no evidence of improper police conduct causally related to the petitioner's decision to confess, his fourteenth amendment claim is without merit.
 
 
 41
 In any event, the petitioner's claim that the Haldol injection, coupled with his agitated mental state, rendered him incapable of exercising his constitutional rights is not supported by the record. First of all, prior to his first purported suicide attempt he appeared calm, alert, and coherent, and seemed to comprehend the officers' questions. Furthermore, there is no evidence that he suffered from any adverse effects of the Haldol injection; neither the trained professionals at the three hospitals nor the police officers or assistant state's attorney noticed any kind of impairment. Furthermore, by the time of his confession (seventeen hours after the injection) about half of the Haldol had been metabolized. According to the state's expert witness (whose testimony the state courts were entitled to credit), the amount of Haldol in the petitioner's bloodstream, if it had any effect at all, actually would have made him less anxious and agitated.[9] As the appellate court noted, the petitioner's behavior in making his statement was inconsistent with that of someone whose will was overborne: his confession was calculated to limit its incriminating effect,[10] and he demonstrated an ability to control the interrogation when he wished to, stopping the interview with Assistant State's Attorney Corboy and requesting to speak with an attorney. Accordingly, the court concludes that the petitioner's confession was voluntary.
 
 V. CONCLUSION
 
 42
 For the foregoing reasons, the court concludes that the petitioner knowingly, intelligently, and voluntarily waived his Miranda rights and that his confession was voluntary. The court therefore denies the petition for a writ of habeas corpus.
 
 
 
 *
 After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." See Fed.R.App.P. 34(a); Circuit Rule 34(f). Plaintiff-Appellant has filed such a statement and requested oral argument. Upon consideration of that statement, the briefs and the record, the request for oral argument is denied and the appeal is submitted on the briefs and the record
 
 
 [1]
 The State does not contend that this withdrawal precludes the petitioner from presenting for federal habeas review his constitutional claim. In a related note, this court already has ruled that Grounds Two and Three of the petition are merely different branches of the petitioner's involuntary-confession claim--not separate claims--and that, in any event, the petitioner already has presented these grounds in a civil rights suit in this district. See Madden v. Glen, No. 83 C 8474 (N.D.Ill. June 3, 1986); see also Petition at 3
 
 
 [2]
 The court also denies his motion for appointment of counsel because his claim is without merit and because, given that there are no overly complicated legal or factual questions, an attorney would not have contributed appreciably to the presentation and disposition of the case
 
 
 [3]
 The petitioner also was questioned about other, unrelated crimes--not solely the Creekmore murder
 
 
 [4]
 At the suppression hearing there was some disagreement about whether the petitioner was treated at Cermak Hospital; for example, the defense expert, Dr. Morrison, believed that he was not taken to Cermak. Nevertheless, the Illinois Appellate Court found that there was evidence that the police did in fact take him to Cermak, especially since the physicians at the suppression hearing relied on medical records from Cermak. Accordingly, since this finding is supported by the record, this court must defer to it
 
 
 [5]
 Dr. Jirku testified that had he been aware that the petitioner had been administered Haldol, he would have diagnosed him as having suffered an acute psychotic episode and would have been more insistent on sending him to a hospital with psychiatric facilities, which Cook County did not have. (Cermak, however, was equipped with such facilities.) As the Illinois Appellate Court noted, however, Dr. Jirku did not testify that he had made an explicit order to admit the petitioner to such a facility. 148 Ill.App.3d at 997, 501 N.E.2d at 1303
 
 
 [6]
 The confession was read into the record at the bench trial. Record at 573-76
 
 
 [7]
 The petitioner did not testify at the suppression hearing
 
 
 [8]
 Moreover, the court would come to the same conclusion even if this inquiry were subject to the de novo review of Miller
 
 
 [9]
 Since this factual finding is supported by the record, this court must defer to it, especially since the state trial court judge was in the best position to make credibility determinations in resolving the conflicting testimony of the experts
 
 
 [10]
 The petitioner claimed that he had not intended to kill Ms. Creekmore, only to rape her; that he hit her head against the elevator door when she struggled; and that he did not realize she was dead (or seriously injured) when he fled from the elevator. Record at 574-76